ALBANY,
January, 1816.

MAURI
v
HEFFERNAN.

---

## MAURI *against* HEFFERNAN.

The defendant entered into an obligation, with the plaintiff, as his surety, at *Caraccas,* which not being performed, the plaintiff, the surety, was compelled, by proceedings at law, to pay the amount for his principal: in an action by the surety against the principal, it was held, that a copy of the obligation, (which, according to the laws of the *Spanish* colonies, was made before a notary, who kept the original and delivered copies to the parties,) authenticated according to the laws of *Spain,* connected with evidence that the original could not be procured, and with proof of admissions, by the defendant, of its authenticity, and of the breach of the contract, was sufficient, without producing the decree against the plaintiff, and the original obligation, or a sworn copy of it.

Where a contract has been broken, the surety may pay the money without suit, and recover against his principal.

A party who would excuse himself from responsibility, on the ground that he acted as the agent of another, ought to show that he communicated to the other party his situation as agent, and that he acted in that capacity, so as to give a remedy over against his principal.

THIS was an action of *assumpsit,* brought to recover money paid by the plaintiff, as surety for the defendant. The cause was tried at the *New-York* sittings, in *May,* 1815, before his honour the chief justice.

The defendant entered into a contract with the royal administration of tobacco, at *Caraccas,* for the purchase and exportation of a large quantity (1,500 quintals) of tobacco, which was an article of royal monopoly, and could only be purchased from the government, or its agents. He, afterwards, executed a bond or obligation, with the plaintiff as his surety, to the royal administration, to secure the payment of the value of 956 quintals and 93 pounds tobacco, described in the bond as the re-

mainder of the 1,500 quintals previously contracted for. The
bond was as follows: "In the city of *Caraccas*, on the 18th
day of *November*, in the year of our Lord 1805, before the
chief notary of the administration of tobacco, and before the
witnesses hereunder written, personally appeared in his dwell-
ing house, Don *Pedro Edwardo*, of this place, merchant, to me
known, who declared that Mr. *John Heffernan*, citizen of the
*United States of America*, and resident in the port of *Laguira*,
hath constituted him his attorney for the execution of this
written instrument, which he is to execute with Don *Jose
Mauri*, his surety, or with his certain attorney, in his name, to
answer for the value of 956 quintals and 93 pounds of dry cured
tobacco, now in *Puerto Cabello*, the remainder of 1,500 quin-
tals contracted for with the administration, by said *Heffer-
nan*, on the 13th day of *July*, in the present year, for the value
of which he is to answer in one month from the date of this
instrument of surety, which said power of attorney he has ex-
hibited to me, and which is as follows, to wit. (Here the power
of attorney from *Heffernan* to *Edwardo* is set forth *in hæc
verba*.) Don *Jose Carbonel*, also personally appearing, said,
that Don *Jose de Mauri* having become surety for the aforesaid
*Heffernan*, has given to him a power, constituting him his attorney
for the execution of said written obligation and deed, which
he exhibited to me, and whose tenor is literally as follows.
(Here the power from *Mauri* to *Carbonel* is set forth.) And
making use of the faculties by said powers upon them confer-
red, in the names of their principals, they renounce, &c. ; (the
benefit of certain laws ;) and Don *Jose Carbonel*, in the name
of Don *Jose Mauri*, said, that he recognises and constitutes him
such security and principal payer of the sum to which the afore-
said 956 quintals and 93 pounds of tobacco, dry cured, may
amount, binding him jointly with Mr. *Heffernan*, who to the
same is bound by his attorney, Don *Pedro Edwardo*, jointly,
and *in solidum*, to be paid, in case of non-compliance with the
stipulations of the contract aforesaid, renouncing, as they have
expressly renounced in the names of their principals, and under
the conditions stipulated, which are, first, that the tobacco
aforesaid shall be exported as soon as possible. Secondly, that
the said tobacco shall be examined, weighed, and marked, as
quick as possible, in the stores of the king, the dangers of rob-
bery and fire being on account and risk of the royal administra-
tion ; and on account and risk of their principals, the damage

ALBANY,
January, 1816.

MAURI
v.
HEFFERNAN.

which may occur to said article from their delay in exporting it, together with storage. Third, that within ten days after the delivery of said tobacco for loading, the value of which shall appear from the invoice to be made out at the time of the acknowledgment and delivery must be paid. Fourth, that in case government should prohibit the entry of the vessel, which is to come in ballast, to take off the remainder of the tobacco in *Puerto Cabello*, that then all responsiblity shall cease, and the contract shall also be considered null, and the royal administration be answerable for the damages thereby occasioned, under which conditions, and the terms aforesaid, Don *Pedro Edwardo*, and Don *Jose Carbonel*, renounce, &c. (the benefit of certain laws.) For the due observance of which the aforesaid Don *Pedro Edwardo*, and Don *Jose Carbonel*, bind the persons of their principals, their property and effects, which they now have, or which they may in future acquire, granting, in the names of their principals, full power as is by law required, to the judges and justices of his majesty, to compel them to the due observance and fulfilment of this instrument in writing, by executive measures, as if judgment were already given thereupon, renouncing, &c. In testimony whereof they executed and signed the same for their principals, in the presence of *Manuel Lopez*, Don *Pedro Guzman*, and Don *Juan Hustado*, of this place, and which I attest, *Pedro Edwardo*, *Jose Carbonel*. Before me, *Matteo de Amitesarona*, notary of the royal administration."

Six or eight months after the execution of this obligation, a decree was passed against the plaintiff, by the intendant, for the amount of the tobacco specified in the contract, and by the influence of the plaintiff's friends, the execution of the decree was delayed for two years, when the plaintiff being informed by the king's assessor, that it was impossible longer to delay the execution, presented a petition to the intendant for leave to pay the amount by monthly instalments, and, in the mean time, to be allowed to export the tobacco. On this petition it was ordered that the plaintiff be permitted to export the tobacco upon giving further security for such payments, whereupon *Roman Perez de la Portella* was offered and accepted as security, and *Joseph Paccanius Y. Nicolan*, (whose deposition was read at the trial,) at the plaintiff's request, undertook to pay the instalments as they might fall due, and he accordingly did pay into the royal treasury, in five different instalments, the sum of 20,518 dollars and 7 reals, in discharge of the said obligation; the last of which

payments was made the last of *August*, or beginning of *September*, 1808. The discharge of the bond was as follows:

" *Caraccas*, 17th day of *September*, 1808. On this day, before me, at the request of Don *Jose Mauri*, his excellency the intendant, with the advice of the assessor general, ordered the instrument in front to be cancelled, said *Mauri* having paid the sum of 20,518 dollars and 7 reals, which thereby appears to be due by *John Heffernan*, and said *Mauri* paid the sum, as security, according to the representation of the administrator general; and, that the same may be no longer of any force, I note the payment thereof, in conformity with a decree issued this day; which documents will be found in the bundle of vouchers which I sign and attest. *Amitesarona*, notary. It agrees with the original, which is in the register, under my care; and to deliver the same to the concerned, I caused this copy to be made, which I sign in *Caraccas*, on the 26th day of *September*, in the year 1808. *Matteo de Amitesarona*, chief notary of the royal administration." "We, citizens *Jose Feliz de Arauda*, treasurer to the army, and *Diego Jugo*, minister of the revenues, in this port, and *Andres Martinez*, fiscal notary, &c., certify, that citizen *Matteo Amitesarona*, by whom the preceding documents are authorized, is the chief notary of the administration of tobacco, and that to his instruments entire faith and credit are given, both in courts of judicature, and elsewhere. In testimony whereof, the present is given, in the port of *Laguira*, on the first day of *November*, 1811. *Jose Feliz de Arauda, Diego de Jugo, Andrès Martinez*."

On the bond and cancelment being produced at the trial, the defendant's counsel objected, that the original obligation ought to be produced and proved, or that a copy, sworn to, and compared with the original, should be produced. The plaintiff, thereupon, proved, by Don *Mariano Velasquez*, who had received the degree of doctor in the civil law, at *Madrid*, that, by the laws of *Spain*, and her colonies, all contracts are executed before a notary, and remain with him of record, who gives to the parties certified copies, under his signature; that the copies, thus authenticated, are read in all courts and tribunals where the *Spanish* laws prevail; and if used in the place where the notary resides, his single attestation is sufficient; but, if used in other places, his attestation is verified by the attestation of two other notaries, or two king's officers, who certify the notary's

handwriting. The witness stated, that the paper produced was in due form, according to the laws of *Spain*, and her provinces, to entitle it to be read in evidence in the *Spanish* courts. The chief justice permitted it to be read in evidence. There was other evidence as to the law of *Spain*, on this point, as to the authenticity of these documents, and of the signatures to them, which it is unnecessary to state.

*Paccanius*, in his deposition, in addition to the foregoing facts, stated that, being about to come to the *United States*, he was charged with the adjustment of the plaintiff's claims against the defendant, and, soon after his arrival at *New-York*, had several personal interviews with the defendant, on the subject, and left with him the plaintiff's account, containing a charge of 20,513 dollars and 87 cents, paid to the royal administration of tobacco, at *Caraccas*, as security for the defendant. In these conversations, the defendant did not dispute the justice of the plaintiff's claims, nor question the accuracy of any of the *items* contained in the account, and acknowledged that the plaintiff had entered into the contract as security for him; but insisted that, in all the transactions relating to the tobacco, he had acted as the agent, and on the behalf, of *Frederick Baker*, and that the plaintiff ought to look to *Baker* for payment. The deponent exhibited to the defendant, among other papers, which, on examination, he admitted to be genuine and authentic, the copy of the bond, &c., which was given in evidence. In the course of conversation, the defendant told the deponent, that he had not sent a vessel to take away the tobacco, being apprehensive that she would not be admitted, on account of *Miranda's* expedition.

The deposition of *Juan Yellas Y. Ferra* confirmed the statements, in *Paccanius'* deposition, respecting the tobacco contract, and the payment of it, and mentioned similar admissions which had been made by the defendant to him; and also stated, that the plaintiff sold the tobacco, after he had kept it for a long time, to a Mr. *Denker*, of *St. Thomas*, pursuant to the advice of respectable merchants. In the year 1807, or 1808, the deponent went to *St. Thomas*, on his own business, and carried with him an order from *Mauri*, on *Denker*, for the price of the tobacco; but it was publicly understood, at that time, that *Denker* had failed. *Denker*, afterwards, however, paid a part to *Mauri's* nephew, who was sent by *Mauri* for the purpose. The deponent also stated, that he had no reason to imagine that

the plaintiff, when he became surety for the defendant, was acting in the behalf of *John Serra*, (who was alleged by the defendant to have been the principal in the transaction,) or that the money that the plaintiff was compelled to pay, was paid out of the funds of *Serra*, or that the plaintiff was, in any manner, indemnified by *Serra*.

The plaintiff produced in evidence certain letters from the defendant to the plaintiff; in one of which, dated *February* 7th, 1806, the defendant says: " I shall despatch, towards the end of this present month, a vessel, if circumstances will permit, for the rest of the tobacco that I contracted for in *Puerto Cabello ;* but, at all events, I shall take care to indemnify you from your suretyship to the royal administration of tobacco." In that of the 6th of January, 1808, he says: " I am very sorry that you, and Don *Pedro Edwardo*, have not annulled the contract that I foolishly signed for the sake of Don *Juan Serra*. My friend, be under no apprehension that you will, in any manner, suffer in the affair, notwithstanding that you were the agent or attorney of *Serra* : I am, and will be, the only victim." In another letter, of the 23d of *June*, 1810, he says : " At your convenience, you will do me the favour to inform me in what manner the affair of the tobacco, that they so perfidiously threw upon my shoulders, was adjusted, and whether you had to pay any thing, and how much ; for, probably, before many months elapse, you will see me in your city ; or, otherwise, I shall find a person, in whom I have full confidence, to see you, for the purpose of settling and clearing up the unfortunate affair, and of claiming from the contractors what they owe. Repetitions are useless ; but you will perfectly remember the manner in which they deceived me, when, in presence of yourself and Don *Manuel*, the contract was made with Don *Juan Serra*, in his own name, and in that of the intendant and *Linares*, for two cargoes, which I afterwards sent, consigned to you, as agent or attorney of *Serra*, and, according to agreements, presuming that they would perform it with good faith."

On the part of the defendant, the deposition of *Francis Gonzales de Linares* was read ; the deponent stated, that he was acquainted with *John Serra*, of *Caraccas ;* that, in the month of *July*, 1805, according to the best of his recollection, *Serra* departed on a voyage from *Laguira* to *Old Spain*, and afterwards returned, but, during his absence, the plaintiff acted as his agent ;

and that the plaintiff was the agent of *Serra*, generally, at *La-guira.* [These facts were confirmed by the depositions previously read on the part of the plaintiff.] That the defendant was at *Caraccas* some time in the month of *June*, or *July*, 1805; that, soon after, the defendant left *Caraccas*, on a voyage to *New-York*; the object of which was, as the deponent understood, to take, from *Caraccas* to *New-York*, colonial produce, in which the proceeds of a certain shipment, made by *Baker & English*, of *New-York*, was invested; and that the defendant acted as the supercargo of the said shipment, and as the agent of *Baker & English.* The deponent recollected the arrival of the ship *Catharine* at *Laguira*, from *New-York*, in the summer of 1805, with, as he understood, a cargo of dry goods, consigned either to the plaintiff, or *Serra*, as his agent; he did not know who was the consignor; the ship was not immediately permitted to enter, but was, for some days, prevented, in consequence of the port being, at that time, shut against the admission of foreign vessels. The deponent remembered the arrival of the ship *Stranger* at *Laguira*, from *New-York*, with a cargo of merchandise, some time in the month of *July*, 1805, which was consigned either to *Serra*, or the plaintiff, as his agent; but he did not know who the consignor was; nor did he recollect whether the ports were open on the arrival of the *Stranger*, but he thought that they were, and that she was admitted immediately to enter. There was a contract between the defendant, *Serra*, and the deponent; to which contract, *Serra* represented to the deponent, the intendant at *Caraccas*, Don *Juan Vicente de Arce*, was a party, the particulars of which he did not recollect; but it was, generally, for the importation of merchandise from the *United States* to *Laguira*, and the exportation of produce in return; and it was agreed that, in case the merchandise, or any part thereof, should arrive when the ports were shut, every facility should be given to *Heffernan*, by the other contracting parties, for its immediate admission. Two days after the contract was entered into, the deponent declined any farther participation in it. The deponent stated, that the contract made respecting the tobacco, was entered into for the purpose of facilitating the admission of the merchandise contemplated to be imported into *Laguira*, in pursuance of the before-mentioned contract. The deponent understood from *Serra*, before he went to *Spain*, that he had left the plaintiff full powers to act

as his agent, generally, and that those powers had particular reference to the before-mentioned contract; the defendant appeared and acted; in these transactions, as the agent of *Baker & English.* The cargoes of the ships *Catharine* and *Stranger* were landed, and put in the plaintiff's stores, and the plaintiff had the general management in making the sales.

The deposition of *William M'Conehey* was read, in which he stated that, in *June*, 1805, he went out as supercargo of the *Stranger,* on a voyage from *New-York* to *Laguira;* that he was employed by *Frederick Baker* and *Jacob Barker*, but that the papers were in the name of *Barker.* The cargo was consigned to the defendant, but the deponent was directed to address himself to *John Serra.* The *Stranger* was not permitted to enter the port until three days after her arrival; and on the deponent asking the defendant how he came to be so fortunate as to get permission for the ship to enter, he replied, that he was obliged to go through the formality of making a sham purchase of tobacco. The cargo was received by the plaintiff, whom the deponent understood to be acting as agent of *Serra.* After the *Stranger* had delivered her cargo, she went round to *Puerto Cabello* to take in some tobacco, as the deponent understood that it was necessary to take in some, as a colourable compliance with the contract of purchase made by the defendant; and they were not compelled to take more than five hundred and twenty quintals; and it was frequently intimated to the deponent, by the king's officer, that he need not take more than he liked. In 1806, the deponent went again to *Caraccas*, and took with him a power of attorney, from the defendant, to himself and Don *Pedro Edwardo,* for the purpose of settling, among other matters, the tobacco contract with the plaintiff. The defendant, under this authority, offered the plaintiff one thousand dollars as a full settlement of all claims he might have against the defendant, on the subject of the tobacco contract, or of the plaintiff's being security therein, and stated to the plaintiff, that he had, in truth, no claim on the defendant on that account, as the defendant was only acting as the agent of *Baker* and others, and as he, the plaintiff, was acting as the agent of *Serra.* The plaintiff, in this conversation, distinctly admitted his knowledge that the defendant had only acted as the agent of *Baker* and others, and that he, the plaintiff, acted as the agent of

*Serra,* and required 3,000 dollars, and two thirds of the commissions, for the tobacco contract, neither of which the deponent was authorized to give; (it being usual, at *Laguira,* for the *Spanish* merchant who does the business, to allow the supercargo one half of the commissions.)

The deposition of *Moses Hillard* was also read, on the part of the defendant, who stated, that about *May,* 1805, he went, as master of the ship *Catharine,* on a voyage from *New-York* to *Laguira,* and the defendant accompanied him as supercargo. The vessel appeared, by the ship's papers, to belong to *Frederick Baker,* who also employed the deponent; and was informed, by *Baker,* that he and one *John English* were jointly interested in the cargo, which, on its arrival at *Laguira,* was to be put into the hands of one *John Serra;* and that the voyage was undertaken in consequence of some agreement which had been made between the defendant and *Serra.* When the deponent arrived at *Laguira,* *Serra* was there, and about to sail for *Europe;* the plaintiff did the business of the vessel, and disposed of the cargo. The plaintiff was generally understood, at *Laguira,* to be the agent of *Serra.* The deponent, before he left *New-York,* understood from *Baker,* that another vessel, with a cargo, was also to sail on the same voyage, under the same contract made between the defendant and *Serra.* About a month after the *Catharine* arrived, the ship *Stranger* also arrived at *Laguira,* and was refused an entry for two or three days, but was at length admitted, and the cargo put into the hands of the plaintiff.

The chief justice charged the jury, that he thought the testimony, in the cause, warranted the conclusion that the plaintiff had paid the amount of the bond for the defendant; that it appeared that, in some transactions, the defendant had been the agent of *Baker & English,* and that, in some transactions, the plaintiff had been the agent of *Serra;* but that there was not sufficient testimony to show that, in the transaction relating to the tobacco, the defendant acted as the agent of *Baker & English,* or the plaintiff as the agent of *Serra.* Besides, if a party would excuse himself from responsibility, because he acted in the capacity of agent, he ought to show that he communicated to the other party his situation as agent, and that he acted in that capacity only, so as to give a remedy over against the person whom he represented to be his principal. That in a

case like that of the tobacco transaction, the plaintiff's becoming security for *Serra*, was not within the scope of the authority of a general agent appointed for commercial purposes.

The chief justice further charged the jury, that if they thought that the plaintiff had misconducted himself, or acted contrary to the custom of the place, in selling the tobacco to *Denker*, they must deduct so much from the plaintiff's demand, because the plaintiff must conform himself to the usage of the place. [Evidence was given, on the trial, respecting the usage as to selling to foreign merchants on credit, which not being referred to in the opinion of the court, it was thought unnecessary to state.]

The jury found a verdict for the plaintiff for 14,808 dollars and 21 cents.

A motion was made to set aside the verdict, and for a new trial.

*Hoffman,* for the defendant, examined the facts, in the case, at large, and contended, that in all the transactions relating to the outward and return cargo of the *Stranger,* the plaintiff acted as the agent of *Serra,* and knew that the defendant acted as the agent of *Baker ;* that the tobacco was, in truth, purchased by the plaintiff, as agent of *Serra,* and for his benefit, though the plaintiff's name, and the formality of giving security, were used, as the best mode of conducting the transaction ; that the accounts were incorrectly stated, without distinguishing what belonged to the parties as principals, and what as agents.

That it did not appear that the plaintiff had ever paid *Paccanius* the money he stated that he had advanced, so as to be entitled to bring this action.

That, by selling the tobacco without apprizing or consulting the defendant, the plaintiff took it on himself, and thereby waived any demand, on account of it, which he might, otherwise, have had against the defendant.

That the *notarial copies,* or certificates, admitted at the trial, were not legal or proper evidence. In this country, and according to the rules of our law, notarial certificates are not evidence, except to prove the protest of a bill of exchange, or proceedings in admiralty courts.

It is true, that in countries where the *civil law* prevails, all contracts are made before a notary, who delivers to the parties copies, certified by him, under his hand and seal. In those

countries the copies may be evidence; but the *lex loci*, though it may govern as to the contract itself, is not the rule of evidence by which the contract is to be proved in the country where the action is brought, and where the proof of the contract must be given. Different countries and states may establish very different rules of evidence. In *Massachusetts* and *Connecticut*, the oath of the party is received in an action of law, in support of his demand. In *Pennsylvania*, the *protest* of a master of a vessel, made before a notary, is received to prove the loss in an action on a policy of insurance. But such evidence is not admissible here.

There ought, then, to have been a commission taken out to examine the notary; and if the original contract could not be obtained, the copy should have been verified, by a comparison with the original, all which might have been shown under a commission. It appears, also, that the contract was executed by the plaintiff, by his attorney *Carbonel*, and the only evidence of any power of attorney, is the same notarial certificate. The originals are not exhibited, nor the copies verified. The notary certifies facts. He does not set forth the contract *in hæc verba*. He speaks in the past tense, and narrates facts. His certificate is not a record, nor a copy of a record. If these contracts are, as is said, always kept by the notary on record, there ought to have been an exemplification of that record, or a copy under seal. In cases under the law of nations, it is true, copies of proceedings of the admiralty court, under seal and signature, are admitted, on proof of the seal, &c.

Again, the plaintiff alleges he paid the money in pursuance of a decree of a *Spanish* tribunal at *Caraccas*. It was essential, therefore, for him to prove this decree by legal evidence. The bond was not for any particular sum; and it was requisite to show how the value of the tobacco was liquidated, for which the surety was made liable. If the liquidation was voluntary, on the part of the surety, he ought to show that it was fairly and honestly made. The only evidence of the decree is this same notarial certificate, without any oath or verification whatever.

*Slosson*, and *Caines*, contra, 1. As to the admissibility of the documents offered in evidence. The powers are set forth *verbatim* in the notarial certificate, and which is, in fact, a copy or exemplification of the record. The court must be satisfied of the genuineness of every paper offered in evidence. For this

object, it is enough to show, first, that the original cannot be produced, and, next, that the paper or copy offered, as its substitute, is true, or properly verified. Though, when the paper is first offered, the court may have doubts of its authenticity, yet if, by the subsequent proofs in the cause, its verity is satisfactorily established, the court will not direct a new trial. The granting a new trial is in the sound discretion of the court, and stands on different grounds from exceptions taken to the evidence. In countries where the *civil law* prevails, the contracting parties go before a notary, who takes down their declarations, and draws up the contract in form, which he keeps, and delivers copies to the parties, which are, in truth, originals and counterparts of the contract. The notary is the *proper officer* to give certified copies. This court has said, that the certificate of a clerk was equivalent to an affidavit,* because he is the proper officer. In *Duncan* v. *Scott*,† Lord *Ellenborough* held, that copies of depositions delivered by a judge's clerk, being in the course of office, were *prima facie* evidence, without being proved to be examined copies. In *Miller* v. *Livingston*,‡ it was held that, where the originals could not be had, copies were admissible in evidence ; it is true, such copies must be duly authenticated. Here we have the confession of the defendant himself, that the documents produced were genuine. This confession of the party is equivalent to the production of the subscribing witness to an instrument.§ The admission of the copy implies the genuineness of the original. What higher evidence of the truth of these copies could have been obtained under a commission ? The defendant, having a notarial copy of the same contract, cannot allege that he is surprised by the copy produced at the trial.

In *Walrond* v. *Van Moses*,|| it was decided, that a copy of an agreement registered in *Holland*, and attested by a *public notary* there, might be given in evidence for the defendant; especially as the plaintiff had taken out another copy of the same agreement, and would not produce it; for he would not be surprised, as he must have known of the agreement, having himself a copy of it.

2. The deposition of *Paccanius* fully establishes the fact of the payment of the money, by the judicial decision or decree of the court at *Caraccas.*

* 1 Caines, 59.
6 Johns. Rep.
286.
† 1 Camp. N. P.
101.

‡ 1 Caines' Rep.
349.

§ 2 Johns. Rep.
452.

|| 3 Mod. 322.

ALBANY,
January, 1816.

MAURI
v.
HEFFERNAN,

3. If the defendant intended to shelter himself under the character of a mere *agent*, he ought to have shown that he disclosed to the plaintiff, at the time the contract was made, the capacity in which he acted; and that he made known his principal, fully and explicitly, so as to enable the plaintiff to resort to the principal. The evidence is, that the defendant, in the case of the *Stranger*, was the agent of *Baker & Barker*, and, in the case of the *Catharine*, the agent of *Baker & English*. If the plaintiff had applied to *Baker & Barker*, they would have said, "this is not our contract; Mr. *H*. has blended the business of others, with whom we have no concern; you must look to him." The plaintiff could not sue one set of principals for one part, and another set of principals for another part of the contract. But the evidence shows, that the defendant did not pretend to act as *agent* in this contract. It was entered into between him, as principal, and the plaintiff as his *surety*. Though a person is an agent, he may still assume individual and personal responsibility relative to the subject of his agency.*

Where an agent, without disclosing his principal, or, which is the same thing, does not disclose all his principals, where there are more than one, makes a contract, he is himself to be treated as principal.†

Again, the authority and duty of a *supercargo* is to sell one cargo, and invest the proceeds in another, or return cargo. The entry of the cargo and vessel, at the custom house, is the peculiar duty of the master. The defendant having gone aside from his duty as supercargo, to enter into this arrangement of the tobacco contract, in order to procure an entry, must be considered as having acted, in that respect, on his own personal responsibility.‡ If the question of the defendant's acting as a mere agent, or not, rested on facts, it was for the jury to decide; and they have determined the fact. If it depended on the written documents produced, those documents clearly show that he acted as principal.

Again, the factor and principal, or owner, may each sue for the same cause.§ Where a contract operates on two parties, each may sue; but if one sues, it is a bar to an action by the other; and if the owner, or principal, does not sue, the factor may bring the action.

*7 Term Rep.
181.

† George v. Clag-
gett, 7 Term Rep.
359, 360, 361. n.

‡ 3 Johns. Cas.
70.

§ 1 Hen. Bl. 85.
Bull N. P. 130.
3 Caines, 72.
Comp. 255.

As to the sale of the tobacco, the plaintiff was compelled, *ex necessitate*, by the very act of the defendant, to become his agent as to the tobacco, a perishable article, which he sold, and gave the defendant credit for the nett proceeds. This cannot be considered as any waiver of his claims for indemnity under the contract.

A surety is not bound to stand a suit, but may pay the money in the first instance, and then call on the principal.*

ALBANY,
January, 1816.

MAURI
v.
HEFFERNAN.

*Sluby v. Champlin, 4 Johns. Rep. 461.

*T. A. Emmet*, in reply. The declaration, in this case, contains only the usual money counts. The plaintiff must show that he actually paid money for the defendant, not that another person paid it. Where owner and factor both have actions, they must be special actions on the case.

To understand this case, it is necessary to examine the facts minutely. [Here the counsel examined and remarked on the facts at length.] The tobacco contract was subsidiary to the other, and made in the name of the defendant, but, in truth, for the benefit of *Serra*. It was to facilitate the entry of the *Stranger*; and the plaintiff must have known that the defendant was not acting on his own account, or for his own benefit. The letter of the plaintiff shows this. It is said, the defendant did not disclose the names of his principals; but the plaintiff had the invoice of the cargo, and must have known them.

It is true, in regard to foreign trade, that a *factor* may be sued, because he is on the spot, and his principal, or owner, being abroad, cannot be reached. This rule, however, founded on the convenience of trade, does not apply where both factor and owner reside abroad.

Again, according to the necessary course of this trade, carried on at *Caraccas*, agents there must act in their own names, and appear as principals, in order to keep others out of view.

The confessions of the defendant amount to nothing. They are, in substance, this: " I do not dispute the *items* of your account; I put my defence on higher ground; that I am not liable at all, having acted merely as the agent of *Baker*, to whom you must look."

All subsequent engagements, by letters, are *nude pacts*, or, if the defendant is to be made liable on them, it cannot be in this action, but on special counts.

Again, the extent of the obligation of the plaintiff, as surety,

ALBANY,
January, 1816.

MAURI
v.
HEFFERNAN.

was indefinite and unlimited. It was absolutely essential, therefore, that he should show, by satisfactory evidence, how the amount was liquidated and ascertained. The decree of the court ought to have been produced.

Further, there is no evidence that the plaintiff has ever paid *P.* the money he swears he advanced. *P.* does not say that the plaintiff ever paid him a cent.

Then, as to the admissibility of the documents, or notarial certificates, in evidence. In *Smith* v. *Spinolla,* the very point was decided, though the case does not appear to be reported.(a) In

* Bunb. Rep. 190,191. Wynch, 70.

*Downes* v. *Mooreman,*\* it is stated, that " a copy of an agreement between the abbot of *Quarrer* and the monks of *Lyra,* was produced in evidence; to which it was objected, for the plaintiff, that, by the rules of evidence, it could not be read, being neither a record nor a public thing. But the defendant produced a copy of the statute of *Oxon.* that no book, &c. should go out of the *Bodleian* library; and the court gave leave to read the copy of the agreement in evidence; though they admitted it not to be within the general rules of evidence, but on the very particular circumstances of the case." Here it was expressly

† 1 *Keble,* 117.

shown that the original could not be obtained;† and it was admitted, that to allow a copy, even in such case, to be read, was against the rules of evidence. As to the case of *Walrond* v. *Van Moses,* it is remarkable that it has never been cited, to that point, in any abridgment of the law, or in any treatise on evidence; nor is there any subsequent case to be found grounded on its authority. Besides, in that case, each party had a copy of the original.

It appears, in this case, that a copy only of the power was exhibited to the notary, and he gives a copy of a copy, without any verification by the original. Three citizens certify, that the person who gives the certificate is a *notary ;* there is nothing more. The original and the copy do not appear to have been compared.

Under a commission, the party could go into an examination of all the circumstances attending the execution of the instrument. But if notarial certificates, or copies, are admissible, a party may be surprised at the trial, and have no opportunity to

(a) The judge, before whom the cause was tried, having refused to grant an order to stay proceedings, the counsel delivered to the court a copy of the case, with a written argument, though the court do not hear arguments on an appeal from the judge, or for an order to stay proceedings; and there being no stay of proceedings, the cause was not heard in court.

show any circumstances attending the execution of the instrument, or that it was a forgery.

THOMPSON, Ch. J., delivered the opinion of the court. The right of the plaintiff to retain the verdict, found in his favour, will depend principally upon the question, whether there was competent and sufficient evidence of his having become security for the defendant, and that he had paid the money alleged to have been paid on that account?

It is unnecessary to examine minutely the proof that was before the court at the time application was made for a nonsuit; for, admitting there was not evidence enough, at that time, to warrant a recovery, yet, if the deficiency was afterwards supplied, and there was proof sufficient to support the verdict when found, the present motion cannot prevail.

With respect to the instrument, by which it is alleged that the plaintiff became security for the defendant, the proof is abundantly sufficient to show that the *original* could not be produced upon the trial. According to the laws of the *Spanish* province, where this instrument was executed, the original, or the one actually signed by the parties, remains with the notary before whom it was executed. Copies, certified and signed by the notary, are delivered to the parties; and such copies, thus authenticated, are received in evidence in all the *Spanish* tribunals.

It is unnecessary definitively to say, whether the *lex loci* ought so far to prevail, as to require these notarial copies to be admitted in evidence here, in the same manner as in the *Spanish* tribunals. I am inclined to think, however, they ought not to be received as sufficient, *per se;* but I cannot think they are to be entirely disregarded, and treated as mere nullities. They ought to be received as forming a part of the inferior evidence of the execution of the instrument, when the original cannot be produced and proved. It appears to be a part of the official duty of the notary to give copies; he is specially intrusted with that power; and, in giving such copies, he acts under his oath of office. The instrument is executed before him in his official capacity, and an official certified copy, necessarily implies that he saw the instrument executed. In what respect does this differ from an examination upon a commission? He can only swear he saw the instrument executed, and that the copy furnished by him is under oath. Besides, we ought to be cautious

in declaring that we will receive nothing short of the examination of the notary, under a commission, as there is no mode of enforcing such examination ; nor is a sworn copy, proved by a person who has compared it with the original, any higher or better evidence than that furnished by the notary, which is a copy under his oath of office. But the evidence furnished in the case before us is more satisfactory than either, arising out of the repeated, uniform, and uncontradicted confessions of the defendant, contained in his letters, and to witnesses, whose testimony was before the jury. *Paccanius*, who, in behalf of the plaintiff, applied to the defendant for payment, swears that he showed him the documents given in evidence, which purported to be notarial copies of the instrument, whereby the plaintiff became security for the defendant ; and the cancelment of the contract, upon the payment of upwards of 20,000 dollars by the plaintiff, as security for the defendant, in conformity with a decree of the *Spanish* tribunal ; that *the defendant examined the papers, and, without any hesitation, recognised them as genuine* and *authentic.* In addition to this, he acknowledged to this witness, that the plaintiff had entered into the obligation on the tobacco contract, as security for him. This witness also exhibited to him an account, containing the charge of 20,518 dollars and 87 cents, paid to the royal administration of tobacco at *Caraccas*, as *security* for the defendant, and referring to the instrument executed on that occasion. The defendant did not dispute the justice of the plaintiff's claim, nor question the accuracy of any of the *items* contained in the account, but insisted only that he acted as agent, and in behalf of *Baker ;* and that the plaintiff ought to look to him for payment. To *Serra*, another witness, the defendant acknowledged that the plaintiff was bound as security for him. This witness also confirms the testimony of *Paccanius*, with respect to the defendant not disputing any of the items contained in the account presented to him. These acknowledgments furnish evidence of an express admission that the copies offered in evidence were genuine and authentic copies of the original, and serve to *identify* the instruments beyond all dispute. If any thing more could possibly be wanting, it is furnished by the defendant's letters. In the one of the 7th of *February*, 1806, he apprizes the plaintiff that he should send a vessel for the rest of the tobacco, and adds ; but, at all events, I shall take *care to indemnify you for your suretyship to the royal administration of*

ALBANY,
January, 1816.

MAURI
v.
HEFFERNAN.

tobacco. Again, in his letter of the 6th of *January*, 1808, he admits he entered into the tobacco contract, and tells the plaintiff to be under no apprehensions that he shall in any manner suffer in the affair. And, as late as 23d of *June*, 1810, he writes, that he had been made the victim in the affair of the tobacco, and wanted to be informed whether the plaintiff had to pay any thing, and how much; promising either to go himself, or send some person, for the purpose of settling the unfortunate affair. If the confessions of the defendant, either by parol or in writing, are at all to be received in evidence, they are amply sufficient, in this case, to show a due execution of the instrument whereby the plaintiff became his surety. This instrument was not under seal; so that no objection on that account can be made. I see no objection, nor, indeed, was any made on the trial, to the admissibility of such evidence. In the case of *Hall* v. *Phelps*, (2 *Johns. Rep.* 452,) it is said, that the confession of a party that he gave a note, or *any instrument precisely identified*, is as high proof as that derived from a subscribing witness.

That the plaintiff has paid upwards of 20,000 dollars on account of the breach of the defendant's contract with the *Spanish* government, is established, not only by the admission of the defendant, but by the positive evidence of *Paccanius*, who swears that he did, at the plaintiff's request, by his orders, and in his behalf, pay the money into the royal treasury, in pursuance of the decree. It was unnecessary to prove the decree, as a breach of the contract which the defendant made with the *Spanish* government, is fully shown by the admissions of the defendant. In his letter of *February*, 1806, he speaks of sending a vessel for the rest of the tobacco, if circumstances would permit; and he expressly admitted to *Paccanius* that he had not sent a vessel to take away the tobacco, being apprehensive she would not be admitted on account of *Miranda's* expedition.

If the contract was broken, it was not necessary for the plaintiff to stand a suit. If the liability of the surety, and a payment of the money by him, be shown, it will be sufficient to warrant a recovery against his principal.

In answer to all this, it has been urged that the plaintiff was the agent of *Serra*, and, therefore, has no right to recover on his own account, even admitting the defendant's liability to *Serra;* and, also, that the defendant was acting as the agent of other persons, and cannot be made personally responsible, but

recourse must be had to his principals. I cannot discover, from the evidence in the case, any thing to warrant, or even to give colour, to the conclusion, that, with respect to the tobacco contract, the plaintiff was acting as the agent of *Serra.* The allegation of the defendant, to that effect, in his letter of *January,* 1808, is too vague to deserve any consideration; it is at variance with the contract itself, and with the general tenor of the defendant's conduct and confessions, and might very well have been an afterthought in the defendant, to endeavour to shift the loss from his own shoulders. Nothing is to be collected from the contract itself, to show that the plaintiff acted in behalf of *Serra;* nor is there any evidence that he represented himself to the defendant as such agent, when he entered into the security. If such had been the fact, there can be no doubt that it would have appeared upon the face of the contract. This the parties well understood, for they made the contract by their agents, as appears by the instrument, and the authority of the agents as set out. It is not to be credited that, if the plaintiff had authority from *Serra* to become surety for the defendant, he would not have appeared in that character in the transaction. There is no doubt that the plaintiff was the agent of *Serra,* during his absence in *Spain,* and there is considerable testimony tending to show that, in the sales of the cargoes of the *Catharine* and *Stranger,* he acted in behalf of *Serra.* But these were mercantile transactions, altogether distinct from becoming security for the performance of a contract in which *Serra,* from any thing that appears, had no interest or concern. If the defendant has procured the plaintiff to become security for him, in his own name, and he has been compelled to pay the money, it very illy becomes the defendant, now, to say he is responsible to *Serra,* and not to the plaintiff. Before the plaintiff is turned around to *Serra* for indemnity, it ought very clearly to appear that he has a remedy against him. If the plaintiff ever made the acknowledgment stated by *M'Conehey,* as to his being the agent of *Serra,* it must have related to a mercantile agency, and not to an authority to become security on the tobacco contract. At all events, this was matter for the consideration of the jury. *Ferra,* who appears, from his examination, to have been well acquainted with the circumstances, in relation to the tobacco contract, and the payment of the money by the plaintiff, says he has no reason to imagine that the plaintiff, when he became surety for the

defendant, was acting in behalf of *Serra*, or that the money which the plaintiff was compelled to pay, as such surety, was paid out of the funds of *Serra*, or that the plaintiff was in any manner indemnified by *Serra*; nor is the evidence sufficient to prove that the defendant acted as the agent of any person, in making the tobacco contract. The contract, itself, does not recognise him in that character; nor does the evidence show that, at the time of making the contract, he represented himself as such agent. No power was shown, giving him authority to make any such contract. It is hardly credible that the plaintiff would have become security upon the credit of others, without seeing some authority in the agent to pledge their responsibility. The defendant has not, even now, furnished any evidence that he had authority to make such a contract for *Baker*, or any other person. He went out as supercargo of the *Catharine*, but that did not vest him with authority to make the contract for the tobacco. It was totally unconnected with his duties as supercargo. Indeed, it is very uncertain now, from the evidence in the case, who were his principals; whether *Baker* alone, or *Baker & English*, or *Baker & Barker;* and the plaintiff would be entirely at a loss to determine who are his principals.

The correctness of the legal position stated to the jury, and by which they were to test the evidence, has not been questioned, that if a party would excuse himself from responsibility, because he acted in the capacity of agent, he ought to show that he communicated to the other party his situation as agent, and that he acted in that capacity, so as to give a remedy over against the person whom he represented as his principal. The testimony in this case furnishes no such evidence. The defendant, therefore, cannot excuse himself on this ground. It is unnecessary to travel through the various items of the accounts; for, if the defendant is at all answerable for the money paid on the tobacco contract, he is, at least, liable to the amount of the verdict found by the jury. And that he is so answerable is, I think, very clear. The motion for a new trial must, accordingly, be denied.

*Motion denied.*