Roussin vs. Parks.

BOUSSIN vs. PARKS.

A confirmation under the act of Congress of April 29, 1816, of a claim recommended for confirmation by the recorder of land titles, enures to the benefit of the confirmee, and a certified, copy of the opinion of the recorder of land titles, recommending the claim to Congress for confirmation to the extent of a league square, is evidence that the claim is embraced within the act of April 29, 1816, as all the claims recommended by the recorder for confirmation were confirmed by that act.

ERROR to Washington Circuit Court.

Cole, for Plaintiff in error.

1. The marriage contract between Francis Tayon and Pelagia Chauvin was improperly received, because it does not appear that the instrument belonged to the archives of the French or Spanish government, therefore it was not evidence of itself; and there was no other proof offered. — Acts 1838, p. 42–5.

There is no proof of the time when the marriage contemplated by the contract took effect, so as to show the concession granted during the marriage, without which proof the contract is a nullity, so far as the land in controversy is concerned; nor will the legal title to the land pass to the plaintiff by virtue of said contract alone, so as to enable her to sustain the above action.

The land being a concession from the king was not that species of property that entered into common right, but remained the exclusive right of the husband; and there being children surviving the husband, the widow was excluded from all right to such property. — 11 White's Compilation, 82.

2. The copy of confirmation of the recorder of land titles, and survey for a league to Pierre Chouteau, part of the 10,000 arpents in controversy was legal evidence in the cause, and illegally excluded by the court. — See L., p. 251, sec. 6, 7; 12 Peters' Rep., 412; 6 Ibid., 770, 771; 4 Mo. Rep., 459; 6 Ibid., 106.

3. The deed from Francis Tayon to Pierre Chouteau, dated 3d January, 1804, for the 10,000 arpents in controversy, was legal evidence on part of the defendant, and illegally excluded by the court. — 1 Phil. Ev., 348–51.

4. The confirmation of the residue of the 10,000 arpents by the late board was improperly admitted to go in evidence to the jury, because it is no evidence of a confirmation under the act of Congress of July 4th, 1836. That act only operates upon certain claims, in certain transcripts of certain reports, and there is nothing in these proceedings to show that this is one of them. — See the act.

5. As to the first instruction asked by plaintiff, and given by the court —

The cases referred to in Peters' Reports were decided upon the peculiar words of the Florida treaty, and do not apply. The survey relied upon in support of plaintiff's title, as sufficient evidence of title under our statutes, is good only against one not having a better title; and it is submitted, that the confirmation in this case to Pierre Chouteau, with the accompanying title deeds, show that title to be in the defendant.

6. The third instruction asked by plaintiff, and given by the court, is erroneous —

Because this claim is not shown to be one of those confirmed by act of Congress, 4th July, 1836; and as to the residue of the *instruction* about "*representatives,*" it is wrong, for such term includes devisees, heirs, purchasers — which the *instruction* given denies to be a legal representative.

7. The fourth instruction, asked ,and given on part of plaintiff, should not have been given, because it has no application, and because the confirmation to Chouteau does not exceed a league, as made by recorder, and because the act of recorder was subsequently confirmed by Congress. — Act Congress, 29th April, 1816.

8. The instructions numbered 1, 4, 5, 6, 9, 11, 12 and 13, asked to be given by defendant, and refused by the court, were legal; and the mere reading of the instructions will show, that the refusal of the court to give them violated the plainest principles of law. As to one of them, see 12 Peters, 454; and as to the others, all the evidence in the cause.

9. Besides what is above stated, it is insisted that the verdict is against law and evidence in this — the title to the confirmation of a league was clearly in Pierre Chouteau; and whatever doubt might exist as to title to the residue of the 10,000 arpents, it was not shown that the defendant was in possession of any part of that residue. — See plaintiff's evidence, L. M., 234; Strother *vs.* Lucas, 12 Peters, 454.

*Note.* — By the Spanish law, the husband, being the head of the community, could dispose of the property acquired during marriage, without the consent or concurrence of the wife, whether the property were real or personal, and the title made in terms to wife or husband. — 3 Febrero, 164, No. 26; 3 Recopilacion, 426, law 5, from J. Spaulding.


FRISSELL, BIRD, *and* BRENT, *for Defendant in Error.*

1. The certificate of confirmation by the recorder of land titles was properly excluded from the consideration of the jury. First: It purports to be a copy of a record, and upon its face shows that it is not a copy of the whole record, but is a mere index to the record. Second: Because, upon its face, it shows that the recorder of land titles had not power to act upon the claim. — Laws of the United States, Geyer's Digest, 464, sec 3; *Ibid.*, 476, sec. 1.

2. The copy of the plat of survey was properly excluded, it appearing upon its face to have been made for Pierre Chouteau under Charles Tayon, and no evidence offered in connection with it to show that it was even intended for the survey of the land confirmed to Pierre Chouteau under Francis Tayon.– Laws of Mo., 251, sec. 6.

3. The paper purporting to be an original conveyance from Francis Tayon to Pierre Chouteau, was properly excluded from the consideration of the jury. First: Because the paper purports to have passed from the custody of M. P. Leduc, a private individual, to the recorder of St. Louis county, on the 24th of May, 1837, and never to have belonged to the archives of the French or Spanish government, or to have been deposited in the office of the recorder of land titles by virtue of any law of the United States. (Acts of 1838–9, p. 42, sec. 3–5.) Second: Because, although the hand-writing of Delassus was duly proved, yet there was no

*Roussin* vs. *Parks.*

evidence offered to show that the said Delassus was either dead or out of the jurisdiction of this Court. Third: Because they did not prove the hand-writing of Francis Tayon, the grantee, or offer any evidence for that purpose.— Statute of Mo., p. 121, sec. 16, 17, 18: 1 Starkie, 333, and note.) And, fourth: Because it could not be read in evidence as an ancient deed, because there was no evidence offered of any possession in accordance with it.

4. The marriage contract between Pelagia Chauven Charleville and Francis Tayon was properly admitted in evidence under section five of the acts of 1838, 9, Geyer's Digest, 332, sec. 7; Geyer's Dig., 189, sec. 5.

5. The copies of the papers, documents, and proceedings before the different boards of commissioners, in relation to the claim of Francis Tayon, and the certificate of confirmation by the late board, were properly admitted in evidence, but their effect as evidence was a proper subject of instruction for the court.— Laws of Mo., 251, sec. 7; Acts of 1838, 9, sec. 4.

6. The first instruction prayed for by the defendant, to wit—" That the plaintiff cannot recover in this cause, unless the jury shall find, from the evidence, that she was legally entitled to the possession of the premises in controversy, at the commencement of this suit," was properly refused by the court, because that instruction refers a matter of law to the decision of the jury. She being entitled to the possession of the premises in controversy is an inference of law from all the material facts of the case, and, as such, could only be legally drawn by the court, and not by the jury.

7. The third instruction prayed for by the defendant, to wit—" Nor can the plaintiff recover, if the jury shall find, from the evidence, that she has an undivided interest in said land with others," was properly refused, because the plaintiff having an undivided interest, is no legal bar to an action of ejectment.

8. The fourth instruction prayed for by the defendant, to wit—" Nor can the plaintiff recover in this action, unless the jury shall find, from the evidence, a lawful marriage contract existing between Francis Tayon and the plaintiff, and that the marriage of said Tayon and plaintiff did take place in pursuance of that contract between them, and that said contract did invest the plaintiff with the right she claims in this action, and that Tayon is dead," was properly refused by the court, because whether the said marriage contract did invest plaintiff with the right to one-half of the land or not was a question of law, and not a proper question for the determination of a jury.

9. The fifth instruction prayed for by defendant was properly refused, to wit— " If the jury shall find, from the evidence, that there is an outstanding title to the premises in dispute, in any person better than plaintiff's, then the plaintiff cannot recover in this action," because this instruction refers a matter of law to the determination of the jury.

10. The sixth instruction prayed for by the defendant, to wit—" If the jury shall find, from the evidence, that there was a marriage contract between the plaintiff and Francis Tayon, yet the proof ' *per se* ' will not justify them in rendering a verdict for the plaintiff in this action," was properly refused by the court: first, because the law requires that the court should instruct the jury in the English

language, if they instruct them at all; and, second, because after the translation of the instruction into the English language, it would require the jury to find their verdict upon a state of facts which had no existence.

11. The eighth instruction prayed for by the defendant, to wit—"There is no evidence before the jury to identify the plaintiff in this cause, or that she was ever married to the said Francis Tayon, under whom she claims," was properly refused by the court, because there was evidence on both points. (See deposition of Ceri.)

12. The ninth instruction prayed for by the defendant, to wit—"That there is no evidence before the jury that the defendant is within the lines of the confirmation of 2,944 arpents confirmed by the report of the late board of commissioners, by the act of Congress of the 4th of July, 1836," was properly refused by the court, because the plaintiff did not claim 2,944 arpents, but 10,000, as confirmed by the act of Congress of July 4th, 1836, according to the report of the late board of commissioners, and there was evidence of the defendant's being within the lines of the survey of the 10,000 arpents.—See Le Mora's testimony, and the deed from Chouteau to Roussin.

13. The tenth instruction prayed for by the defendant, to wit—"That there is no evidence that the 2,944 arpents confirmed by the act of Congress of July 4th, 1836, on the report of the late board of commissioners, were surveyed since the confirmation," was properly refused, because it is immaterial whether the survey has been made since the confirmation, provided it appears to have been made by proper authority under the French or Spanish government, and recorded according to the usages of the country prior to the 10th day of March, 1804; and because there was no confirmation of 2,944 arpents offered in evidence in the cause; the confirmation offered in evidence being for a tract of land according to the concession on a concession for 10,000 arpents.—Laws of Mo., 234, sec. 2; see "Confirmation and Concession."

14. The eleventh instruction prayed for by the defendant, to wit—"If the jury shall find, from the evidence, that the plaintiff in this action, and Pierre Chouteau, are tenants in common in the land in controversy, then, unless the jury shall further find that the plaintiff has been ousted from the possession before the commencement of this suit, they must find for the defendant," was properly refused; first, because there was no evidence that Chouteau and plaintiff ever had been or claimed to be tenants in common, but as far as there was any evidence of Chouteau's claim, he claimed to the exclusion of all others; and, second, because what constitutes an ouster is properly a question of law.

15. The twelfth instruction prayed for by the defendant, to wit—"If the jury shall find, from the evidence introduced on the trial by the plaintiff, that seven thousand and fifty-six arpents, or a league square of the ten thousand arpents, had been confirmed to Pierre Chouteau by the government of the United States, by their board of commissioners, then the said plaintiff is estopped to deny the title in Pierre Chouteau in said league square, and must find for the defendant, unless they shall further find that the trespass complained of has been committed on other lands, to which the plaintiff is lawfully entitled to the possession, and of

*Roussin* vs. *Parks*.

which the defendant held the unlawful possession at the commencement of the action," was properly refused, because there was no evidence given by the plaintiff, proving or conducing to prove at the trial, that 7,056 arpents, or a league square of the 10,000 arpents had been confirmed to Pierre Chouteau by the government of the United States, by their board of commissioners, and because no less no less than two distinct legal propositions are submitted to the decision of the jury by said instruction, to wit — the plaintiff being legally entitled to the possession and the defendant being illegally in the possession of certain supposed premises.

16. The thirteenth instruction prayed for by the defendant, to wit—" If the jury shall find, from the evidence in the cause, that Pierre Chouteau is the legal representative of Francis Tayon to the land in controversy, then the plaintiff cannot recover in this action," was properly refused, because there was no evidence in the cause that Pierre Chouteau is the legal representative of Francis Tayon, and whether he is a legal representative or not is a question of law.

17. The fourteenth instruction prayed for by the defendant, to wit—" That the late board of commissioners of the United States for the adjustment of land titles in the State of Missouri had no lawful authority to annul previous confirmations made by other commissioners, or the recorder of land titles: but if such has been done in the case of Francis Tayon and Pierre Chouteau, then the last confirmation, so far as it conflicts with the first confirmation made by F. Bates, recorder, is void," was properly refused, because there was no evidence offered to show that any previous confirmation had been annulled by the late board of commissioners, and because, if it had been shown that F. Bates, recorder of land titles, had confirmed a part of a claim for more than a league square to the extent of a league square under the act confirming this jurisdiction to claims not exceeding a league square in extent, the confirmation of the recorder in such case would not be voidable but absolutely void.

#### SUPPLEMENTAL.

The marriage contract was an authentic act, and as such proves itself.— See White's new Recopilacion, vol. 1, p. 41, particularly note 3; and page 296, same book, and acts 1838, 9, p. 42, 3, sec. 5 and 12.

Under the fifth section of the act of 1838–39, a marriage contract is evidence of title, and this marriage contract bears internal evidence, or rather evidence upon its face, and by its endorsements, of being an authentic act.

Marriage contracts are almost universal, in countries governed by the civil law, and in many instances they affect property, both real and personal, to large amounts.

It is contended, that upon the facts presented by this record, the question of the power of the husband to sell the property of the community does not arise, the defendant below having offered no competent evidence that such a sale had been made, and, again, the law referred to in Mr. Cole's brief does not, by any means, sustain his position.

*Opinion of* TOMPKINS, *Judge.*

Pelagia Parks, the defendant in error, brought her action of ejectment in the Circuit Court of Washington county, to recover the possession of ten thousand

arpens of land against Etienne Roussin, and judgment being rendered there in her favor, Roussin, to reverse it, prosecutes this writ of error.

On the trial of this cause the plaintiff, defendant in error here, gave in evidence the petition of Francis Tayon, dated the 15th of October, 1799, to Delassus, then lieutenant-governor of Upper Louisiana, for the ten thousand arpens of land here sued for, and a concession, &c.

The plaintiff also gave in evidence a copy from the recorders of the first and last boards of commissioners, of their actions upon this claim of Francis Tayon. By this copy it appears that this claim was twice rejected. It was presented each time by Peter Chouteau, as assignee of Francis Tayon; first, on the 3d May, 1806, to the board consisting of commissioners Lucas, Penrose, and Donaldson ; and, second, on the 18th of August, 1810, when it was rejected by Penrose and Bates, commissioners, Lucas being absent afterwards, to wit, on the 18th day of February, 1833, it appears to have been again presented.  The entry is as follows : " Francis Tayon, by his legal representative, Pierre Chouteau, sen., claiming the balance of ten thousand arpents of land, a league square, of which has been confirmed, (see book C., pp. 379, 380, minutes No. 4, p. 464; No. 3, p. 64, wherein a league square has been confirmed,) produces a paper purporting to be a commission from Charles D. Delassus, dated October 15th, 1799, &c.  It is further stated, that on the 7th November, 1833, the board met, present, A. G. Harrison, F. R. Conway, L. F. Linn, commissioners.—Francis Tayon claiming 10,000 arpents of land, &c.  The board are unanimously of the opinion, that this claim ought to be confirmed to Francis Tayon, or his legal representatives, &c.

.The plaintiff, Parks, also gave in evidence a marriage contract, purporting to have been entered into betwixt Taylor and herself, certified to have been recorded in St. Louis county, the 8th February, 1818, by the recorder of that county. This contract bears date the 8th day of June, 1795, and appears to have been signed by them in the presence of witnesses, Antonio Soulard, the lieutenant-governor, and others, parents, relatives, and friends, except Pelagia Chauvin, (the defendant in error,) Francis Brazeau, and Joseph Tayon, who, not knowing how to sign their names, have made the sign of the cross, according to the custom of the village in such cases.  Francis Tayon, the person in whose right this woman claims this land, signs his name to this marriage contract under which she claims, and the date of this marriage contract is five years anterior to the petition to the lieutenant-governor for the land in question; to which petition he affixed his cross, as is said to have been the custom of the village.  No proof of the execution of the said marriage contract was offered.  The plaintiff then read in evidence the deposition of Pascal Ceri, taken on 2d March, 1840.  This witness stated that he knew Francis Tayon, son of Joseph Tayon : Francis Tayon married Pelagia Chauvin Charleville, now the widow of Arthur Parks, deceased : Francis Tayon left one son, Francis N. Tayon: he knew Francis Tayon, son of Charles Tayon and nephew of Francis Tayon, senior, deceased; he is now about forty or forty-five years of age, according to the witness' recollection: he knows, by report, that the first wife of Pierre Chouteau, senior, was the daughter or granddaughter of Joseph Tayon, senior.  By the terms of the above marriage contract the widow,

there being one child of the marriage, was entitled to one-half of the property of Francis Tayon, her deceased husband, whether that property be real or personal.

The plaintiff further introduced evidence of her being a widow, and that Roussin resided on the survey of the said two thousand arpens of land. She also gave in evidence a deed from Pierre Chouteau to the defendant Roussin and Felix Valle, for a certain portion of the said land set out by metes and bounds, amounting to 1,988 arpens.

All the evidence offered by the plaintiff was objected to, but the Circuit Court permitted it to go to the jury, and exceptions were taken to such decisions of that Court.

The plaintiff's evidence being closed, the defendant offered in evidence a paper purporting to be, "Opinion of the recorder of land titles for Missouri territory, as to the claims entered under the act of 13th of June, 1812, and proved before the 1st of January, 1814, as provided by the act of the 3d of March, 1813," &c.

The statement is in tabular form, as those statements are commonly made; and it appears, from the paper offered in evidence by the defendant, that this same tract of land, claimed by the plaintiff in the Circuit Court, had been confirmed to Peter Chouteau, under Francis Tayon, by the recorder of land titles, to the extent of one league square; or rather that one league square of this tract of land had been recommended by the recorder to Congress for confirmation; and it appears by the second section of the act of 29th April, 1817, (6 Laws United States, 138; and 1 Land Laws, 69,9 700,) that all the claims he recommended were confirmed.

The acting recorder certified this to be truly extracted from book No. 3, p. 64, &c., of the five books left in the office, purporting to be in the handwriting of the late recorder Frederick Bates, and to be his decisions on land claims since the adjournment of the late board; and this statement is endorsed—"They were arranged and fairly transcribed for report to the commissioner of the general land office, but not yet recorded in the books, because they have no authority till sanctioned by government;" dated, "St. Louis, November 1, 1815," and signed, "Frederick Bates."

This paper was objected to by the plaintiff's counsel, and the Circuit Court sustained the objection. The defendant excepted to its opinion. The defendant then offered in evidence a plat and certificate of survey of said tract of land, which was also excluded, and exceptions taken. The defendant then offered in evidence a deed in the Spanish language. The clerk of the Circuit Court of St. Louis county who is ex-officio recorder of said county, certifies, that the foregoing deed is truly recorded in his office in Lirre Terrein, and it appears to have been filed for record on 24th May, 1837, by M. P. Leduc. From the translation of this deed, it appears, for the want of a scrivener, to have been executed before the lieutenant-governor in the presence of the witnesses of assistance, Don Juan Robayana and Don Joseph Hortiz, by Francis Tayon, junior, and Pierre Chouteau: Tayon conveys the tract of land of 10,000 arpens, as conceded by the lieutenant-governor, and Chouteau accepts, &c.

This deed is dated the 3d day of January, 1804, and to it Tayon appears to

have subscribed his name. The defendant then read in evidence the depositions of Julius Demun and Jean P. Cabana, taken on the 15th day of June, 1839.

Demun states, that "he is acquainted with the Spanish language; that he has examined the deed in that language herewith presented, and identified in the margin with the letter A., purporting to be a conveyance from Frances Tayon, son or junior, to Pierre Chouteau; that he has translated the same, and that the document herewith exhibited and identified in the margin with the letter B., is a true translation of the Spanish document aforesaid; that he is acquainted with the handwriting and signature of Charles Dehault Delassus, the subscribing witness to said Spanish document, &c., and believes it to be his signature. The word "higo," in the deed herewith presented, marked A., literally signifies son, and is generally used to signify junior, and has the same meaning as the French word "fils," or the English word "junior."

John P. Cabana states, that he has examined a Spanish document referred to in the foregoing testimony of Julius Demun; that he is acquainted with the signatures of Carlos Dehault Delassus, Pierre Chouteau and Joseph Hortiz, subscribed to the same, from having frequently seen them write, and these signatures he believes to be the proper signatures of those persons respectively. He further saith, that the body of the said Spanish document is in the proper handwriting of Joseph Hortiz. The deponent further saith that he knew Francis Tayon, son of Charles Tayon, who was the son of Joseph Tayon, who was the oldest of that name in this country, called Joseph Tayon, senior. He also knew another Francis Tayon, called Francis Tayon, senior, who was brother of Charles Tayon, son of Joseph Tayon, senior. This Francis Tayon married the daughter of the widow Charleville, who was called Pelagia, and who is now the widow Pelagia Parks; that at the date of the Spanish deed aforesaid, he knew of no other Francis Tayon than Francis Tayon the son of Joseph Tayon.

Francis Tayon, the son of Charles (is) now living, and is about thirty–six years of age: deponent never knew him to be called Francis Tayon, junior. At the date of the deed aforesaid deponent resided in the town of St. Louis, where also resided Francis Tayon, the son of Joseph Tayon. Charles Tayon then resided at St. Charles with his family; where his son Francis resided deponent does not know. At the date of the deed referred to, deponent did not know of any Francis Tayon called Francis Tayon, junior, but he was called simply Francis Tayon, and this was Francis Tayon, higo, or son, of Joseph Tayon, senior.

The Circuit Court decided that this evidence was not sufficient to authorize the reading of the deed, and accordingly excluded it, and its decision was excepted to.

The jury having found a verdict for the plaintiff, the defendant moved for a new trial for several reasons, which, all being common-place reasons, will, like the exceptions, be noticed generally.

On the trial of the cause the plaintiff prayed, and the court gave the instructions following:

1. If the jury shall find, from the evidence, that the land claimed was surveyed by a duly authorized officer under the Spanish government, for Francis Tayon, deceased, prior to the 10th of March, 1804, it became private property, seperated

*Roussin* vs. *Parks.*

from the domain of the king, and did not pass to the United States so as to enable them to sell or give it to any other, but was protected to said Francis Tayon, or his legal representatives, by the treaty of 1803, beween the United States and France, and, without that treaty, by the law of nations.

2. That a survey so made as aforesaid is sufficient to enable the person from whom the survey was made, or his legal representatives under our statute, unaided by any act of Congress, to maintain ejectment against any person not having a better title.

3. That the act of Congress of the 4th July, 1836, confirmed this claim to the original grantor, or his legal representatives, and that by construction of law no person can be regarded as such representative except by purchase, devise, descent, or marriage contract, so as to show title under the original claimant.

4. No act of Congress prior to 1816 empowered or authorized any board of commissioners or recorder to adjudicate or decide on land claims in the late territory of Missouri exceeding one league square, therefore neither said Francis Tayon nor his representatives can be barred by such act of Congress.

The defendant asked, and the court refused, the following instructions, viz.:

1st. That the plaintiff cannot recover in this action unless the jury shall find, from the evidence, that she was lawfully entitled to the possession of the premises in controversy at the commencement of this suit.

2d. That the plaintiff cannot recover, if the jury shall find that she has an undivided interest in the land with others.

3d. The plaintiff cannot recover in this action, unless the jury shall find that there was a lawful marriage contract existing betwixt Francis Tayon and the plaintiff, and that a marriage did take place betwixt said Tayon and the plaintiff, in pursuance of that contract, and that said contract did invest the plaintiff with the rights which she claims in this suit, and that Tayon, the husband, is dead.

4th. If the jury shall find that there is an outstanding title to the premises in dispute, in any other person, better than the plaintiff's, then the plaintiff cannot recover in this action.

5th. If the jury shall find, from the evidence, that there was a contract of marriage betwixt the plaintiff and Francis Tayon, yet that proof *"per se"* will not justify them in rendering a verdict for the plaintiff in this action.

6th. There is no evidence before, to identify the plaintiff in this cause, or that she was married to Francis Tayon, under whom she claims.

7th. There is no evidence before them that the defendant is within the lines of the confirmation of 2,944 arpents, confirmed on the report of the late board of commissioners, by the act of Congress of 4th July, 1836.

8th. If the jury shall find, from the evidence, that the plaintiff and Pierre Chouteau are tenants in common of the land in controversy, then, unless the jury shall find that the plaintiff has been ousted by the defendant from the possession of the said land, before the commencement of this action, they must find for the defendant.

9th. If the jury shall find, from the evidence introduced on the trial by the plaintiff, that 7,056 arpents, or a league square of the 10,000 arpents, had been

confirmed to Pierre Chouteau by the government of the United States, by their board of commissioners, then the said plaintiff is estopped to deny the title to Pierre Chouteau in said league square, and must find for the defendant, unless they shall further find that the trespass complained of has been committed on other land to which the plaintiff is lawfully entitled to the possession, and of which the defendant held the possession at the commencement of this action.

10th. If the jury shall find, from the evidence in the cause, that Pierre Chouteau is the legal representative of Tayon to the land in controversy, then the plaintiff cannot recover in this action.

11th. That the late board of commissioners of the United States, for the adjustment of land titles for the State of Missouri, had no lawful authority to annul previous confirmations, made by other commissioners or the recorder of land titles, and the action of the last board, on a claim confirmed by a former board, or by the recorder of land titles, is a mere nullity.

The defendant, plaintiff in error here, excepted to the opinion of the court overruling his motion for a new trial, and in giving the instructions prayed by plaintiff, defendant in error here, and in refusing the instructions asked by himself.

Mr. Bird, for the defendant in error, says—"There was no evidence before the jury except that produced by the defendant in error, Pelagia Parks; and therefore if the court below committed any error, it must have been either in receiving evidence which should have been rejected, or in rejecting that which should have been received; or in refusing or giving some instructions, or in overruling the plaintiff's motion for a new trial. The defendant in error insists that there is no error in any of these particulars."

"1. The marriage contract, made in due form before the lieutenant-governor, was what is called in all countries governed by the civil law, 'an authentic act,' that is, an instrument that proves itself, and, by the Spanish law, a certified copy without the original would have been conclusive evidence.

"It is not in the power of our legislature to pass a law to destroy that evidence which would have been conclusive under the old law once in force here, and which is, in many instances, the only evidence of ancient titles.—Owen *vs.* Hull, 9 Peters, 625, 626.

"By an act of the Missouri Territory, passed in December, 1815, it was made the duty of the recorders in the several counties, on application for that purpose, &c., to record any paper found among the archives, and deliver the original to the applicant.

"Without this law, no notarial act could leave the Spanish archives, and by it a copy of the recorded instrument was made evidence in the same manner and with the like effect as the copy of deeds acknowledged and recorded since the change of government. This law was unnecessary, and passed in ignorance of the law in force, and with the belief that without this law a copy was not evidence. But this law made the original of an act thus recorded evidence, because a copy could not, according to this law, be read, without accounting for the original. The endorsements of the recorder on this contract, and the certificate of record, are evidence conclusive that this contract was found among the Spanish archives, and the

68

original recorded and delivered under this act, for the recorder shall be presumed to have done his duty. He charges for the search, and without this act he had no authority to record this contract.—Geyer's Digest, p. 332.

"This act is repealed by the revised code of 1835; but it should have been received in evidence, under the act of 1839, on Evidence, p. 42.

"No evidence was rejected that should have been received. The tabular statement, said to have been extracted from the books of recorder Bates, should not have been read in evidence—

"1st. Because it does not purport to be a full copy of all the evidence on which he acted.

"2d. Because Bates had no power to confirm lands, but only to report them for confirmation.—See act of Congress for the adjustment of land claims in Missouri, passed in 1812, '13, '14.

"These reports were confirmed by an act of Congress of 1816. A copy of Bates' reports is to be found only in the office of the commissioner of the general land-office, and a copy from this office is the only evidence that could be received to prove what was confirmed by the act of 1816, unless a full copy from the office of the recorder, showing the nature of the claim, the evidence before the recorder, and his decision thereon, might be received.

"But Bates had no power to act upon, or recommend for confirmation, any claim exceeding in extent a league square. The law never contemplated that a larger claim might be acted upon, and a part of it confirmed. (Geyer's Digest, acts of 1807, p. 464; act of 1813, p. 472; acts of 1816, p. 478; also, Strother vs. Lucas, 12 Peters, 453, 454.) The construction of this act is, that no claim is confirmed by this act of 1816, except such as are contained in the report of the recorder, made in pursuance of the laws under which he acted.

"There was no error in rejecting the alleged deed to Chouteau.

"1. Because it was never acknowledged or proved, or recorded according to any law now or heretofore in force.

"2. It was not made before any officer of the Spanish government; for in 1804 Spain had no jurisdiction here, and if Delassus acted as an officer at all, he acted as an officer by permission and sufferance of our government.

"3. There is not only no evidence that the deed was ever among the Spanish archives, but that it could not have been there, because by law it could not have been left there except under our act of 1815, which was repealed in 1825, and Ruland's certificate shows that it was filed for record in 1837. If this deed were recorded betwixt 1815 and 1825, the fact would appear by the recorder's certificate, and if it were after 1825, it must by law still have remained there, because after that time the recorder had no power either to record it or to let it go out of the office; after 1825, a copy of the notarial act not recorded according to the act of 1815 was the only legitimate evidence; and a copy in French was produced by the defendant, and if the plaintiff did not have it translated and read to the jury it was his fault. All the evidence, then, proper to be read was there for the jury to consider, if the plaintiff wished to avail himself of it. But the deed could not be read, according to our law, without identifying the grantor to be the

original claimant of the land in dispute, and the proof is that the deed was not from the original claimant, but from a boy, the son of Charles Tayon, if from any one.

"There is another reason why this deed should not have been read in evidence — whether, in fact, it were the deed of the old or young Francis Tayon? One-half of the land in dispute, by virtue of the marriage contract, vested in the defendant, and her first husband could only convey his interest in such land, that is, one-half of it."

Mr. Bird then tells of the three divisions of property under the Spanish law, which, as I consider it irrelevant to this case, I will pass it over.

He then proceeds thus:—"The concession to Tayon was special in its location; it was surveyed prior to the 10th March, 1804; it was made by a proper officer, and duly registered. Under our statute regulating the action of ejectment, this survey of itself, and proof of the marriage contract, and the marriage made out, the plaintiff's right of possession according to the principles established by various acts of Congress in relation to land claims originating under the Spanish government, a special call in the concession for a particular piece of land, or a survey made prior to the 10th of March, 1804, was regarded as separating the land so conceded from the king's domain, it thereby became private property, and did not pass to the United States by the cession of Louisiana.—See the case of The United States *vs.* Perchman, 7 Peters' Reports, from p. 86 to 91; and Smith *vs.* The United States, 10 *Ibid.*, 330, 331."

He admits, that "The case of Strother *vs.* Lucas may be relied on as an authority that Francis Tayon and widow have forfeited all claim to the land sued for by failing to file notice as required by law, and that the confirmation of 1816 must enure to the benefit of Chouteau, who did file notice." This decision, in this particular, was, he says, "not in accordance with the opinion of the minority of the court; it is contrary to all the decisions on the same point in Louisiana; it is thought to be unsatisfactory to the bar generally, to the public, and to Congress. It has long been the settled opinion in Louisiana, settled by a series of able judicial decisions, and which decisions are by the bar deemed to be correct, that a confirmation amounted to a mere relinquishment by the United States of their interest in the land confirmed, and left it to the courts to determine between adverse claimants who had the better title. This is well known to have been the unanimous opinion of the late board of commissioners." Chief Justice Taney's opinion, who had been counsel for Strother, and did not sit in his case, is also alleged to be adverse to the decision of the Supreme Court of the United States.

The most material point necessary to be settled in order to decide this case, as it seems to me, is this:—What is the effect of a confirmation by the act of Congress of 29th of April, 1816, on the recommendation of the late recorder of land titles, successor to the powers and duties of the first board of commissioners, established by the act of Congress of 2d March, 1805? By the fourth section of this act it is provided, that "persons claiming lands in the territory by virtue of any legal French or Spanish grant made and completed before the first day of October, 1800, &c., may, and every person claiming lands in said territory shall,

&c., deliver to the register of the land-office, or recorder of land titles within whose district the land may be, a notice in writing, stating the nature and extent of his claim, &c."

The fifth section of that act provides, that "each board, or a majority of each board, shall have power to hear and decide, in a summary manner, all matters respecting such claims; also, to administer oaths, to compel the attendance of, and examine witnesses and such other testimony as may be adduced; to demand and obtain, from the proper officer or officers, all public records in which grants of land, warrants, or orders of survey, or any other evidence of claims to land, derived either from the French or Spanish government, may have been recorded; to take transcripts of such record or records, or of any part thereof; to have access to all other records of a public nature relative to the granting, sale, transfer, or titles of lands within their respective districts; and to decide in a summary manner, according to justice and equity, on all claims filed with the register or recorder, in conformity with the provisions of this act," &c.

Thus we see, that persons having French and Spanish grants may deliver a notice, while those having incomplete grants are required to do so.—Section fourth, as above.

By a proviso to this fourth section, "where lands are claimed by virtue of a complete Spanish or French grant, it was not necessary for the claimant to file any other evidence of his claim recorded, except the original grant or patent, together with the warrant or order of survey, and the plat."

The lieutenant-governor tells us, in terms plain and explicit, that this is not a complete title, for he directs the surveyor, Don Antonio Soulard, to put Tayon into possession, to draw him a plat of his survey, deliver it to him, with his certificate, in order to serve him to obtain the concession and title in form from the intendant-general, "to whom alone (he says) corresponds, by royal order, the distributing and granting all classes of the royal domain." This is Mr. Bird's own evidence of the law of his case. But we have higher evidence than the declarations of the lieutenant-governor. At page 530 of the second volume of the land laws, we find it ordered by the King of Spain that the governor-general of Louisiana alone be authorized to grant lands. At page 537 of the same commences a correspondence betwixt Morales, intendant-general of Louisiana, and Manuel Gayoso Delermos, governor of that province, from which we find that in 1797 the right to grant land was transferred from the governor to the intendant of Louisiana. The lieutenant-governor, then, residing at St. Louis, had, under the Spanish authority, no right to grant land, as he himself declares, and as is also evident from the authorities above referred to.

Mr. Bird, then, is altogether mistaken in his supposition, that a special call in the concession of a particular piece of land, or a survey made prior to the 10th of March, 1804, was regarded as separating the land conceded from the king's domain in all cases, and that the land so conceded did not, in all cases, pass to the United States by cession of Louisiana to the United States, and the case of Perchman vs. The United States does not support him. In that case the land was granted by the governor of Florida, who had a right to grant, and did grant, by

giving a patent for the land.    There is also a difference in the language of the treaty with Spain and that of France, as appears by the same case, United States *vs*. Perchman.    The United States, then, were placed on the same ground on which Spain stood before she ceded Louisiana to France.    This person, (Tayon) or his assignee, was bound in a reasonable time to apply to the intendant of Louisiana for a grant for this land; and the United States, succeeding to all the rights of Spain, had the right to prescribe within what time, and on what terms, this complete title, called a patent, might be obtained.    They did prescribe the conditions, and by several acts of congress extended the time for applying.    The powers of the recorder under the act of 13th June, 1812, have been shown to be the same as those of the board of commissioners to which he succeeded.

The fifth section of the act of 2d March, 18.'5, after giving to the board the authority to demand and obtain from the proper officer all records in which grants of land, &c., derived either from the French or Spanish government may have been recorded, &c., directs also that they shall have access to all other records of a public nature relative to the sale, transfer, grants or titles of land, and to decide in a summary manner, according to justice and equity, on all claims filed with the recorder.

Thus we see that the board were to have access to other records than those in which the grants of land, warrants, or orders of survey, &c., derived either from the French or Spanish government, were contained.    These other records to which they were to have access related to the granting, sale, transfer, or titles of land, one could naturally suppose, betwixt individuals, and on the claims they were to decide according to law and equity.    Those who failed to file their claims within the time prescribed were for ever barred.    That Congress had the power to subject these claims to the possession of land to the summary tribunal for decision, I cannot doubt, and that, by the language above quoted, they did so, can hardly be doubted by any person who will take the trouble to read the law.    Tayon and his alienee had already shown an utter disregard of the authority of Spain in delaying, from the year 1799, to demand a complete title.    The United States had the same right to take advantage of their neglect that Spain had ; and can it be doubted that Spain might, by law, have required the claimants to submit to the action of the intendant of the province within a prescribed time, their claims, to be decided on by the intendant, not only as against the government, but as betwixt vendor and vendee ? in no other way could these claimants be forced to come in.    We have seen that it required nearly thirty years to have all those claims presented.    When the last board was constituted, those lands had become more valuable, and Congress prescribed a different rule: the confirmations were to the original grantee of the government of Spain, or his legal representative, leaving the legal representative to be ascertained by the courts.

The Supreme Court of the United States, in the case of Strother *vs*. Lucas, has decided that the confirmation enures to the benefit of the confirmee.    But, says Mr. Bird, the minority of the court did not concur in this opinion, and it is well known that Mr. Chief Justice Taney, who had been of counsel for Strother, thought the decision incorrect.    It is not a very strange thing that a lawyer who has lost his

case, should think his client injured. I have rarely known an instance of an attorney or counsellor at law being satisfied with a decision made against the interest of his client. When all the judges do not concur in an opinion of the court, then the reasons of their dissent may be urged with a good grace on a re-argument of the case. So, when great lawyers think the case wrongly decided. But to say that a lawyer, whose client had lost a case, thought it wrongly decided, is to spend one's time in idle prattle; for no man who knows human nature would expect him to be satisfied with such decision. But the strongest argument of all was, that all the last board of commissioners thought the confirmation ought to enure to the benefit of the original grantee. I am apprized that one of those commissioners obtained a license to practice law with as much credit as is common, and for any thing known to me, he may have been very successful in his practice; but, although I lived from the time he obtained his license till his death, within twenty-five miles of his place of residence, I never heard that he ever obtained or ever sought for business: and I can say with much confidence, that he never even appeared in the Supreme Court of this State. I say nothing of the other commissioners, except that they were not lawyers.

As to the learned decisions on this subject in Louisiana, and the approbation of the intelligent bar, all tending to favor his construction of the law, I shall, as he has cited no case, pass it all, observing that I should not consider it any honor to any lawyer who had read the act of Congress, to have it said of him that he entertained the opinion which Mr. Bird here credits to the bar of Louisiana.

The opinions of our first commissioners have been passed over in silence by him, as if they were men entitled to no credit, that is, the first board who settled the construction of this law; which construction, too, was approved in a very decided manner by Congress, when, by the act of the 13th June, 1812, the same powers granted to the old board were continued to Mr. Bates, late recorder of land titles, who had been one of that board, and continued, too, after the construction given to their powers were officially known to Congress. It was again approved by Congress, when all the cases reported by Mr. Bates for confirmation were confirmed by Congress, as he recommended to the alienee of the original grantee of Spain. Mr. Bird well knows, that both Lucas and Bates were men of eminent abilities; that they were lawyers; and he has had also the means of knowing that Donaldson was a distinguished lawyer, and that Penrose, though never a practising lawyer, was a well-educated man; that he studied law with a view to the practice.

But, in his brief, Mr. Bates is treated rather more unceremoniously than a sheriff is treated by a well-matured lawyer, when his return on a writ is sought to be amended. These are the authorities to show that the case of Strother *vs.* Lucas was correctly decided. But no man who reads and understands will therefore contend that the confirmations under the act of 1836 will enure to the benefit of Chouteau, assignee of Tayon, because the confirmations on the recommendation of Mr. Bates, in 1816, did. A very different language is used in the act of 1816 from that of 1836. The act of 1836 confirms to Tayon or legal representatives, and the act of the 29th of April, 1816, confirms simply the claims reported by the recorder

for confirmation.    I have shown that the act of 2d March, 1805, gave the first board, and the recorder, their successor, the power to ascertain the actual owner of the land, by evidence taken before them.    They did so; Congress, officially informed, in the year 1812, that the confirmation was made to the alienee of the original grantee, continued the powers of the first board of commissioners to the late recorder, who was a member of that board, thereby approving the decisions of the old board, and showing their wish that the recorder, under the same powers, should give the same construction to those powers which the board had given: yet Mr. Bird, after telling us, I know not on what authority, that Mr. Chief Justice Taney, the counsel of Strother, did not approve of the decision in Strother *vs.* Lucas, says, "When the act of July, 1836, was passed, this point was much debated by legal men and by members of Congress, and, as he is informed, it was so little a debateable question, that the law of 1836 was passed, containing different provisions from any former act on the same subject." I understand that when Congress passes an act, they are supposed to understand the subject, and that whether they do or not, the courts are to obey their written will.    Indeed, there are always some good lawyers in Congress who will not suffer an act to be passed without explaining the subject.    But as for the opinions of individual members of Congress, they are like the opinions of other men.    If common sense cannot teach us that every man who is elected to Congress does not thereby become a lawyer, we have many living evidences of the fact.

When the act of the 29th of April, 1816, was passed, I presume there were in Congress many good lawyers.

I know of no reason why the opinion of the commisioners, Lucas and Bates, should not be as sound as any man's on this subject.    It being clear, I think, that a confirmation made under the act of the 29th April, 1816, on the report of the late recorder of land titles, enured to the benefit of the confirmee, Pierre Chouteau, it becomes material to enquire whether the extract from his books, certified by the then recorder, was properly rejected by the Circuit Court when offered in evidence by the defendant.

This is the statute law of Missouri:—"Copies of confirmations had before the board of commissioners for the adjustment of land claims within this State, or before the recorder of land titles, duly certified by the recorder of land titles, or by the person who shall, by law, have the custody of the books and papers containing such confirmations, shall be received as evidence."—P. 251, sec. 7, of the Digest of 1835, title, "Evidence."

As before observed, these are called confirmations before the recorder of land titles because the testimony was taken before him, and on his recommendation they were confirmed by the act of Congress of 29th April, 1816.    These extracts have been constantly read in this Court, and this is the first time they ever were objected to, because the recorder recommended only for confirmation.

The form, as above observed, was tabular, and it is not pretended that there is any defect on the face of it, or that it is not duly certified, "but because —

1st: "It does not purport to be a full copy of all the evidence on which he acted.

2d: "Bates had no power to confirm lands, but to report them for confirmation, (referring to the acts of Congress;) these reports were confirmed by the act of 18.6. A copy of Bates' Reports is only to be found in the office of the commissioner of the general land-office, and a copy from this office is the only evidence that could be received of what was confirmed by the act of 1816, unless a full copy from the office of the recorder, showing the nature of the claim, the evidence before the recorder, and his decision thereon, might be received.

3d: " Bates had no power to act upon, or recommend for confirmation, any claim exceeding in extent one league square."

The two first objections are, in fact, but one. It may be observed, that the act of Missouri, making the confirmation evidence, does not require the evidence on which the recorder acted to be copied. It would have been worse than idle to require a copy of the evidence.

Congress had already confirmed his reported cases, and they had been satisfied with the evidence on which he acted in making his recommendation; and neither the State of Missouri, nor any other State in the Union, had the right to decide on the sufficiency of the evidence. But he says a copy of Bates' Reports is only to be found in the office of the commissioner of the general land office. If the certificate of the present recorder of land titles is to be accounted any evidence of truth here, as the law of 1835 seems to make it, we have on this record a copy of Mr. Bates' report in this case. The original appears now to be in the recorder's office, and what is found in the office of the commissioner of the general land office is, I suppose, an exemplification of what remains in the office at St. Louis, and it being made out by an officer intrusted for such purpose, is as much an original as the five small books remaining at St. Louis. This extract, then, from the recorder's books, purporting to be a recommendation of a confirmation to Pierre Chouteau under Francis Tayon, ought to have been received in evidence. This copy, then, being good evidence, establishes the right of Pierre Chouteau to the whole of the league square recommended for confirmation by the late recorder, Frederick Bates, and confirmed by the act of Congress of 29th April, 1816, without the aid of any deed from Tayon to Chouteau; for before Mr. Bates could have recommended this league square for confirmation, he must have ascertained the authenticity of that deed, and we are bound to admit that he did his duty after his acts are approved by Congress. This, as has been above shown, he had power to do, and Congress having confirmed the claim on his recommendation, we must presume they were satisfied, and it was their duty to guard the rights of Tayon, and if they have neglected that duty, I am yet to be informed by what authority the State courts can assume the right to correct the errors or neglects of the tribunals of the United States. But Mr. Bird says, that the action of the late recorder, on a claim to a tract of land of more than one league square, is void. The law says the commissioner shall have power to decide, amongst other cases, where the claim is for a tract not exceeding a league square. But Mr. Chouteau, the claimant, was willing to accept a league square, and trust to the justice or liberality of the government for the remainder, and the recorder recommended one league square of this land for confirmation; and Congress, who have the uncontrolled disposition of this land,

chose, on his recommendation, to confirm it. This they could have done without his recommendation, and his recommendation most certainly could not divest Congress of the power which they before had. But to show that the confirmation is void, Mr. Bird, after referring to the law, cites the case Strother *vs.* Lucas, (12 Peters, 453, 4.) If such has been the decision there, then, whatever may be my opinion of its correctness, I admit that it is the duty of this Court to submit. At page 453 of 12 Peters, we are told, that "the plaintiff (Strother) gave in evidence two opinions of the recorder of land titles, confirming to the representatives of Gomache and Kiercerean the forty arpent lot of each, and directed each to be surveyed; but did not offer the confirmations to Chouteau, by the board of commissioners, which were given in evidence by the defendant."

It must here be observed, that this land, the subject-matter of the suit, had been, in January, 1838, confirmed by Penrose and Bates, commissioners, to Auguste Chouteau, under whom Lucas claimed; and that Mr. Bates afterwards (inadvertently it must have been) confirmed, or recommended for confirmation, the same land to the representatives of Gomache and Kiercerean. But the judge proceeds—"the plaintiff (Strother) claimed under the former, the defendant under the latter: (Chouteau:) that of the plaintiff will be first considered."

"By the 8th section of the act of the 13th June, 1812, the recorder of land titles was invested with the same powers, and enjoined to perform the same duties, as the board of commissioners, which was then dissolved, in relation to the claims which might be filed before the 1st of December, 1812, and the claims which may have been heretofore filed, but not acted on by the commissioners; except that all his decisions shall be subject to the revision of Congress." The judge then adds:— "but these confirmations cannot avail the plaintiff as claimant under these or any other acts of Congress, because, first, the authority of the recorder of land titles was, by the express terms of the act, &c., confirmed to those claims on which the board of commissioners had not previously acted, from which it follows, that after the commissioners have made a confirmation of a specific claim, the action of the recorder is merely accumulative, and so inoperative; or if adverse, merely void, as an assumption or usurpation of power in a case on which he had not jurisdiction, and his action must be a mere nullity." It is then added, that "If Congress could, it never did give him any authority to supervise either the acts of the commissioners or the confirmations of the law."

In the case cited Congress had, by the confirmation of the board of commissioners, parted with all its right to the land confirmed, and without a violation of the right of Chouteau, acquired by such confirmation of the board of commissioners, it could not authorize the recorder of land titles to take up the same case to adjudicate, out of Chouteau, that title which had been acquired by the confirmation of the board of commissioners. This authority, then, is not in point. Nothing hindered Congress to confirm the league square to Chouteau; the title to this land had not passed out of Congress, as in Strother *vs.* Lucas, and Congress had full power to confirm it.

Mr. Pierre Chouteau, then, is by law, and by virtue of this recommendation for confirmation by Mr. Recorder Bates, entitled to the league square of land without

the aid of the deed of Tayon, inasmuch as he must be presumed to have found every fact necessary before he recommended the land for confirmation.

The marriage contract was, for the reasons given by Mr. Bird, (9 Peters, 625, 626) admissible in evidence.—Mauri *vs.* Johnson, 13 Johns., 58, referred to 348 of Phillips' Ev., New York edition of 1816.

Here might end the examination of the evidence rejected, but as the case is fairly before the court, I will examine why the deed from Tayon to Chouteau may not also be admitted in evidence.

This deed purports to have been executed on the 3d day of January, 1804, before the proper authority, to wit, the lieutenant-governor — there being no notary-public — at which time, Mr. Bird says, Spain had no jurisdiction here. His survey appears to have been returned on the 25th day of February, 1804 ; and for his purposes, in his written argument, he says the Spanish government lasted here till 10th March. Yet there was no Spanish authority here, for the purpose of taking the acknowledgment of the deed from Tayon to Chouteau, on the 3d day of January, 1804, nearly two months before his survey was made.

Again, he says, "There is not only no evidence that this deed was ever among the Spanish archives, but it could not have been there, because by law it could not have been left there, except under the act of 1815, which was repealed in 1825, and Ruland's certificate shows that it was filed for record in 1837." When the deed was executed, on 3d January, 1804, it became a record, the property of the government of Spain, and on the change of government, this deed, among other papers and documents, was passed over to the recorder of St. Louis county. On 22d December, 1815, an act was passed, making it the duty of the recorders in the several counties to record all and any papers and documents found in their respective offices, which were received from the Spanish authorities, at the change of government, on the application of any persons for that purpose, &c. There was a subsequent provision, that this applicant should pay the recorder's fees. Now, if this deed had not been found there, or have been deposited there before the change of government, then it could not, under the act of 1815, have been recorded. Accordingly, Mr. Ruland certifies that the deed was truly recorded in Levie Terrein, in his office. He then gives the endorsements made on the deed, in the Spanish language, and makes another certificate, that it was filed for record, in his (Ruland's) office, by M. P. Leduc, on 24th May, 1837. If Mr. Ruland had been a lawyer, well read in the act of 1815, I suppose he would have made on this deed an endorsement in the language of the act of 1815, in words of this import, to wit : that this deed was recorded in his office, *on the application* of M. P. Leduc, made on the 24th May, 1837. So the deed carries on its face all the marks of authenticity that the marriage contract does. The original was produced, and whether wrongfully or rightfully, out of the office, is not now a subject of enquiry.

But this deed could not have been made by Francis Tayon, the deceased husband of the plaintiff, Widow Parks, because the maker of the deed signed the deed in a good business hand, in the year 1804; and Francis Tayon, to whom this land was conceded in 1799, could not write, but made his mark to the petition presented to

the lieutenant-governor. But Francis Tayon, the deceased husband of the widow Pelagia Parks, appears to have signed the marriage contract in the year 1795, four years before the date of the concession, in the same good business hand that the deed was signed in. Then, if the deed could not have been made by Francis Tayon, to whom this land was conceded, because, in 1799, four years before the execution of the deed, this Francis Tayon could not write, for much better reason, Francis Tayon, party to that marriage contract, who could write in 1795, cannot be Francis Tayon who could not write in 1799. The depositions of Mr. Cabana and Mr. Ceri were taken nearly about the same time — Cabana's in 1840, Ceri's in 1839, a few months previous. Mr. Cabana states that Francis Tayon, the son of Charles, was then, in 1840, about thirty-six years old, that is, he must have been, at the date of that deed, one or two years old, and Mr. Cabana lived in St. Louis, where Francis Tayon, husband of this widow, plaintiff, lived. The other Francis might then have been at his mother's breast, where his father lived, viz., in St. Charles. According to the testimony of Mr. Ceri, the younger Francis Tayon might have been four or nine years old, and could not then probably write the good business hand that is imputed to him at the date of that deed. Mr. Cabana states that, at the date of the deed, in St. Louis, where Francis Tayon, "hijo," lived. We are not told where Mr. Ceri lived, and cannot, therefore, duly appreciate his opportunities for getting information. If he had lived in St. Louis, it would certainly have been proved; as it was not proved, it is to be presumed he did not live there. But the testimony of both Demun and Cabana shows that the original Spanish word means son, and is used in reference to his having a father living. But Mr. Bates took the proof of the deed, and it is all settled, by the act of Congress of 1816, that this confirmation enures to the benefit of Pierre Chouteau, and any action of the last board of commissioners, on the land confirmed on the report of Mr. Bates, must be void, because, by the act of 29th of April, 1816, Congress had divested itself of all title to the land recommended by him for confirmation. But unless the jury should believe that Francis Tayon, who signed with his own name the marriage contract, and Francis Tayon, who made his mark to the petition for the land, are, on that account, or for some other good reason, different men, then the widow Parks will be entitled to the one-half of the remaining part of the land, not confirmed on the report of the late recorder, Bates; for the remaining part of the land being confirmed to Tayon or his legal representatives, this confirmation relates back from the time of the confirmation, when Tayon first had the inchoate right of property in it, to the time of the concession, which merely gave Tayon the right to acquire property in that land.

Of the instructions asked by the plaintiff, and given by the court, the first should not have been given. It assumes that the land in contest became private property from the time it was surveyed. The lieutenant-governor declares himself that he had no power to grant land. I have also sufficiently shown, from the second volume of the land laws, that the power of granting land since the year 1798, resided with the intendant-general of Louisiana; also, it is well known that the United States never recognized any such claim to be valid until it was confirmed.

2. The second instruction, standing alone, is well enough. But the court ought

to have told the jury that an action could not be maintained against any one holding under an act of Congress.

3. The third instruction was correctly given, so far as it relates to the excess of 10,000 arpents over one league square, confirmed on the recommendation of the recorder.

4. The fourth instruction was altogether idle. The Congress of the United States have power to confirm any land claim, whether that claim be reported by the recorder or not, so that even if his recommendation be not within the contemplation of the act of Congress of 13th June, 1812, (which can by no means be admitted,) yet still the confirmation by the act of 29th April, 1816, is valid.

Of the instructions asked by the defendant, and refused by the court, the first was properly refused, because it required the jury to decide the lawfulness of the plaintiff's possession.

The second was rightly refused, for she might have been ousted by the defendant, and he might have been co-tenant with her.

The third was correctly refused, because, whether the marriage was lawful, and what rights accrued to the plaintiff from such marriage, it belonged to the court to decide.

The fourth was also correctly refused, because it required the jury to decide the law.

The fifth also should have been refused, because what is a contract is a matter of law, and therefore proper for the court only to decide. I am not disposed to think the two words of Latin ought to vitiate the instruction if it had been otherwise good: for those might be omitted without any injury to the sense, and they are so common that we understand them as well almost as we do the English. It was, however, but a waste of time to ask such a question, for the most dull would know that a marriage must have taken place to give validity to the contract, and there was an abundance of evidence to raise the presumption.

The sixth ought also to have been refused, because there was sufficient evidence to induce a jury to find a marriage.

The seventh ought also to have been refused for the same reason as the sixth, there being same evidence.

The eighth, ninth, and tenth instructions were not authorized to be given by any evidence in the cause, because the evidence of the recorder was improperly excluded by the court, and also the deed from Tayon to Chouteau, and consequently the depositions of Demun and Cabana.

The eleventh instruction should have been given. The word "lawful" is superfluous, for the commissioners could have no authority unless what was given by law, and consequently that authority must be lawful.

For the reasons above given the judgment of the Circuit Court ought, in my opinion, to be reversed.

NAPTON, *Judge.*—The confirmation to Chouteau, by the act of the 29th April, 1816, enured to the benefit of the confirmee, and the certified copy of the recorder's confirmation was improperly rejected.

The admissibility of the marriage contract was considered and decided in the case of McNair *vs.* Dodge, 7 Mo. Rep., 408.

Inasmuch as the court rejected the evidence of the defendant, showing the confirmation to Chouteau of a league square, the judgment must be reversed, and the cause remanded.—Scott, *Judge*, concurs with Judge Napton.