## DAVID H. WILLIAMS v. N. H. CONGER ET AL.

1. ANCIENT INSTRUMENTS.—When written instruments are thirty years old, and have been found where they reasonably would be sought for, are on their face free from suspicion, and have been acted upon contemporaneously, or soon after their apparent date, they are admissible without further proof of genuineness or of execution.

2. SAME.—A power of attorney, with power of substitution, was used in obtaining a final title to an eleven-league grant; the paper was found about forty years thereafter among the papers left by the deceased substituted agent : *Held*, That such place was a reasonable and probable place of inquiry for it, which was sufficient.

3. SAME—MATTERS CASTING SUSPICION.—Facts which may cast suspicion on such document, introduced by the adversary, go to the jury with the paper to be considered; not as a reason for rejection of the writing as testimony.

4. SAME.—See facts held sufficient evidence of an ancient instrument, having been acted upon soon after its apparent date.

5. SAME—EVIDENCE OF HAVING BEEN ACTED UPON.—See corroborative facts held sufficient evidence of an ancient document being acted upon, but of which the court say : "We could hardly hesitate to say that they were not fully sufficient to warrant the jury in finding they conclusively proved its due execution as a question of fact after it was admitted."

6. ACT OF SALE BEFORE A NOTARY.—A transfer or conveyance of land by act of sale, before a notary beyond the limits of Texas, has long been recognized by this court as valid. A duly certified copy of the notary's record is admissible to prove such sale.

7. PROOF OF POWER OF ATTORNEY EXECUTED IN MEXICO.—A power of attorney executed in Mexico, in 1833, before a notary, held duly proven by the following testimony : 1. A certified copy of the act made by a notary, who certified that he was successor to the original notary before whom the act was made, and had his records. 2. Certificate of three notaries to the genuineness of the signature

and seal of the certifying notary. 3. The certificate and seal of the Governor of the Federal District of Mexico, which was verified by the certificate of the proper Secretary of the department of Foreign Relations of the National Government of Mexico, under the seal of that department.

8. IMMATERIAL ERROR IN CHARGE OF COURT.—Where possession is admitted by the defense in an action of trespass to try title, it is not necessary to instruct the jury upon that subject; but in such case a charge formally instructing the jury that the defendants must be shown to have been upon the land when suit was brought, is no ground for reversal.

9. SAME—LIMITATION.—Where limitation is pleaded as a defense, and no testimony supporting the plea adduced, it is not necessary to instruct upon the plea; but plaintiff cannot complain if instructions are given which are not incorrect or inapplicable to the facts, when there is nothing in the record showing that the plaintiff suffered any injustice by that part of the charge.

10. LACHES AS A DEFENSE IN TRESPASS TO TRY TITLE.—The mere failure to pay taxes, or the laches or delay of the owner in bringing suit for the recovery of land to which he has a legal title, will not defeat his action, where there has not been actual adverse possession for a sufficient length of time to support a plea of limitation.

11. PRACTICE IN SUPREME COURT.—This court will reverse where an improper issue has been submitted to the jury, and where it cannot be seen from the record but that the jury may have found a verdict upon such issue, although the verdict upon the law and testimony was correctly found upon the merits.

APPEAL from McLennan. Tried below before the Hon. X. B. Saunders.

David H. Williams instituted suit, in the District Court of McLennan county, on the 11th day of September, 1873, by petition in the ordinary form of action of trespass to try title, for eleven leagues of land, situated in McLennan county, known as the Miguel Rabago grant.

The defendants named therein were Norman H. Conger, Edward D. Conger, Charles M. Harvey, W. H. Smith, W. C. Tolbert, Thomas Harrison, and James Sadler. The defendants pleaded not guilty, on the 11th day of December, 1873.

January, 1876, defendants filed an amended answer, in

which they pleaded the statute of limitation of three, five, and ten years, and that they have held possession of the land in controversy, under title and color of title, for more than twenty years, holding open and notorious possession of the same, cultivating, paying taxes, leasing, and selling the same; and that all their leases and sales have been spread on the records of the county; that during all this time, the plaintiff, nor his vendors, under whom he claims, have paid, nor offered to pay, taxes on the same, nor exercised any acts of ownership over the same, nor set up any claim, until the institution of this suit; that they were guilty of laches, and that the demand was stale.

Plaintiff claimed the land in controversy by conveyance from Antonio Cortez and Rosa M. Cortez, by deed dated the 26th day of July, A. D. 1873, and, as subsequently shown, that Mrs. Cortez, before her intermarriage with Antonio Cortez, was widow of Miguel Rabago, who died in 1848, leaving one child surviving, which died in 1851, aged about 11 years; that Mrs. Cortez was married to Antonio Cortez in 1849, and that they lived together until after the commencement of this suit as husband and wife. She and Miguel Rabago were married in 1825.

Defendants claimed by letter of attorney from Miguel Rabago to Victor Blanco; conveyance from Rabago by Victor Blanco to Gilluermo Lagurenne, executed before Bounilla, a notary public in the city of Mexico, on the 25th of May, 1836; a power of attorney from Lagurenne to Prioland, dated the 10th day of January, 1837, passed before Francisco Madriago, a notary public of the city of Mexico; a conveyance from Lagurenne, by attorney Prioland, to G. L. Hammekin, passed before Louis T. Care, a notary public of the city of New Orleans, dated the 15th day of February, 1837; a conveyance by Hammekin to Louis S. Hargous for one-half the grant, of date November 25, 1858; a conveyance from Hammekin to William M. Goodrich for the remaining half, April 24, 1850; and from Hargous and Goodrich, by Thomas Harrison,

acting under powers of attorney from them, to defendants, of date February 5, 1873.

On the trial, defendants offered in evidence a letter power of attorney as an ancient instrument from Rabago to Victor Blanco, bearing date June 8, 1832. In connection therewith, and as showing that the document came from its proper custody, the following items in evidence were relied on:

1. Defendants had in their possession, and had furnished it to the plaintiff for use on the trial, the original testimonio of title to the eleven-league grant in controversy, and which was also offered in evidence by them.

2. The letter power of attorney, which is dated June 8, 1832, in terms says it hands to Victor Blanco the testimonio of the eleven leagues, (meaning the permit,) and authorizes him, by himself, or through some one in whom he had confidence, to take possession of said land; and further authorizes him alone to sell, exchange, or alienate it, as he might see fit.

3. Indorsed on this letter power is an instrument purporting to be signed by Victor Blanco, authorizing Samuel May Williams to take possession of the land as his agent and attorney. This indorsement bears date April 3, 1833.

4. Hammekin testified that he knew the signature of Victor Blanco, and that the signature to the indorsement is Blanco's genuine signature.

5. On December 3, 1833, (as shown by the papers in evidence constituting the title to the land in suit,) Samuel May Williams presented the permit or concession to the proper officer, asking possession of the land.

6. On January 13, 1834, Williams, as attorney for Rabago, applied for and obtained the final title.

7. It was proved by M. E. Kleburg that he found this paper (the letter power of attorney) in April, 1876, in a very old trunk which Judge W. H. Williams, a son of Samuel May Williams, brought into his office, saying that it contained his father's old papers, and requesting him (witness) to search for

the paper; that the paper when found "seems to be an old paper; it is yellow, not blotted, contains no erasures or interlineations, and its age seems to correspond with its date." Witness found in the trunk other letters purporting to be from Blanco to Williams.

8. It was proved by W. H. Williams, county judge of Galveston county, that his father, Samuel May Williams, came to Texas in 1822, and died in 1858; that witness, in 1876, was forty-three years old; that the trunk spoken of by Kleburg is his (witness') father's trunk, and it appears to be ten or fifteen years older than witness is; that he delivered the trunk to Kleburg, as stated by him; that the trunk was delivered by witness' father to his mother, and by his mother to him; witness is one of his father's executors, and as such has exclusive possession of his father's papers, and has had the trunk since a short time after his father's death; that the trunk was never allowed to be opened since the "runaway scrape" in 1836, except at his father's death, and at one other time, when the La Vega title papers were sought; that the letter power of attorney has on the back of it an indorsement showing what it is, in his father's handwriting; that the letters purporting to be from Blanco to his (witness') father have similar indorsements on them in his father's handwriting.

9. It was proved by Hammekin that he had an official copy of this letter power in 1837, (the year he purchased,) and gave it to Rose, the agent of witness. Witness produced a true copy of the copy he had thus obtained and handed to Rose.

10. This copy produced by Hammekin was an exact copy of the original letter power, the only difference being that some words abbreviated in the original are written in full in the copy produced by Hammekin.

· 11. The defendants proved the loss and search for the following original title papers: An act of sale from Rabago, by Blanco, to Lagurenne; power of attorney from Lagurenne to Prioland; deed from Prioland to Hammekin.

The same testimony, with other facts appearing on the face of the title papers in evidence, was insisted on as showing that the letter power of attorney had been acted upon.   The items of proof to that point were as follows:

1. The letter of attorney was found in Samuel M. Williams' old trunk, as testified by Kleburg.

2. It has an indorsement on it, with Blanco's genuine signature to it, authorizing Williams to take possession of the land.

3. Williams applied for possession, and for final title to the land, and the final title, &c., was delivered to him, as Rabago's attorney.

4. Hammekin bought the land February 16, 1837, and had in his possession what he considered a complete chain of title to the land, including an official copy of this power of attorney, which is an exact copy of the original produced from Williams' trunk.

5. Goodrich owned one-half the land, by deed from Hammekin, from 1850 to 1861; and in May, 1854, not long after the country began to settle, Hughes, acting for Rose, the agent of Goodrich, leased part of the land to Graham; and this lease was transferred to Landon in October, 1854.

6. Thomas Harrison, as agent of Goodrich and Hargous, the latter owning the other half, sold parts of the land to some twenty-five persons, putting them in possession, from 1854 to 1859, and from 1867 to 1868 under quit-claim titles, except that since 1867 he gave warranties to two or three of the purchasers.

7. Harrison was spoken to by the parties under whom defendants claim in 1855 and 1856, and he has acted for them, as their agent for this Rabago grant, from that time up to the sale to the defendant.

8. It was in evidence, by George B. Erath, that Hughes, the agent of Goodrich and Hammekin, was on the ground in 1854, and employed witness as surveyor to establish the lines of the grant, which he partially did; that he thinks Hughes

made arrangements with G. W. Sheek to hold the land for Goodrich and Hargous, and that he (Sheek) remained on it from that time until after the war; that Goodrich and Hargous compromised with persons claiming the Crouch and Neal leagues, which are embraced in the grant; witness surveyed off and divided these leagues in 1857 and 1858; witness was employed by Rose and Hammekin to divide the land between the parties, and has probably made several hundred surveys on the land; thinks that Graham went on Neal league early in 1854, and Landon in the same year, and that Earle succeeded Landon in his possession; witness resided within eight miles of the land; did not see it during the war, but did before and after, and has never seen it vacant; that from the time Hughes came here, in 1854, Rose, Hammekin, and Harrison have been claiming the eleven leagues in question, controlling the same and exercising ownership over it; that on these eleven leagues are many school-houses, gins, churches, and it is densely populated by persons holding under the title had by the defendants.

9. It was proved by Kissick that Sheek was not on a colonist title; that witness went on a colonist title in 1850, and compromised with Rose in 1856, giving one-half for the other; that Brano went on the land in 1852 or 1853, on a preëmption, but afterwards gave that up in favor of the eleven-league owners.

10. The docket of the District Court of McLennan county shows that Hammekin sued Scott and Graham in 1854 for possession of the Rabago eleven-league tract in controversy.

11. It was proved by Hammekin that Rose was always his agent; that he paid the government dues on the land, at one time $800, and at another $400, and that he and his vendees have been claiming the land ever since; that he deposited the original of the testimonio of the title in the land office in 1838, and witness produced the receipt of the commissioner of the land office therefor. Witness had delivered the power of attorney to Rose with other title papers to the land.

Against the introduction of the said power of attorney, the plaintiff insisted that the document was not free from suspicion, and introduced evidence attacking its genuineness. The matters insisted on by plaintiff in evidence, as against the admission of the document, were as follows:

1. The testimony of W. H. Williams, to the effect that the trunk (from which the paper was taken, as testified by Kleburg) was not opened from the time of the " runaway scrape in 1836, to his father's death in 1858,"—the witness also testifying that he was forty-three years old when testifying, in 1876, which would make him less than three years of age at the time of the " runaway scrape," at the time he would have his recollection of the trunk begin.

2. The deed from Rabago to Lagurenne, dated May 25, 1836, in the city of Mexico, recites that the letter power of attorney was shown to the notary before whom the deed was executed in the city of Mexico; and hence that the paper produced from the trunk in Galveston was not the one used in Mexico on May 25, 1836, in making the deed.

3. Manuel Musquez and Rose M. Cortez testified, that neither the body of the said letter (it being exhibited to them) power of attorney, nor the signature to it, was in Rabago's handwriting. / (On cross-examination of the witness, Mrs. Cortez, some matters of suspicion were developed.)

Upon this testimony, the court admitted the power of attorney. The plaintiff, by bill of exceptions, saved the point, having taken full objections to the testimony.

In the progress of the trial, and as evidence of a power of attorney from Gilluermo Lagurenne to Prioland, dated January 10, 1837, and executed in the city of Mexico before Francisco Madriago, under which the deed from Lagurenne to Hammekin was executed, and the loss of original being shown, the following evidence was offered by defendants:

1. A notary, Antonio Ferrero, certifies, under his notarial seal, that he is successor to the notary Madriago, before whom the instrument was executed, and is the custodian of his ar-

chives; that he finds the power in Madriago's book of protocols, and gives a certified copy of it; he copies in his certificate a certificate from the actuary of the Seventh Judicial District of Mexico, that "the judge of the Seventh Judicial District has ordered him (Ferrero) to make a certified copy of the power, in conformity to the laws."

2. The College of Notaries in the city of Mexico, under their notarial and collegiate seals, certify that Ferrero is a notary; that the signature and seal to the first certificate are his, and is entitled to full faith.

3. Perez, the Governor of that Federal District, certifies, under the seal of the Federal District, that the signature and seal of the College of Notaries are the same they use in everything in this manner authenticated by them; that they are a part of the National College of Notaries of the capital; and in compliance with the law of 28th October, 1853, he issues this his certificate.

4. The Minister (or Secretary) of State for Foreign Affairs, under his seal of office, certifies that Perez is the Governor of the Federal District, and that the seal and signature are his.

5. Skilton, United States consular agent in the city of Mexico, certifies that the said signature of the Minister of Foreign Affairs is his genuine signature, and that it, with his seal attached, is entitled to full faith and credit.

Plaintiff urged objections to the testimony, which were overruled, and the copy so attested admitted.

It was admitted that defendants were in possession of the land when the suit was instituted.

On the plea of laches, the court gave the following instructions:

"Defendants also plead the laches of the plaintiff, and those under whom he claims, in bar of plaintiff's recovery in this suit. That is, they say that if every other defense they have pleaded should fail, that plaintiff should not recover in any event, by reason of the fact that those under whom he

claims were guilty of such gross laches or neglect in prosecu-
ting their rights to the land in controversy, if any they ever
had, that they have so slept upon their rights that they ought
not now to be heard to disturb defendants in their possession,
and are, according to the principles of equity and justice, bar-
red and precluded of their right of action.   On this point
you are instructed that this is a defense peculiar to courts of
equity, and it is a maxim that equity assists the vigilant, and
not the careless and negligent; or, in other words, equity
discountenances laches, and, independently of any statute of
limitations, has always refused to interfere when there has
been gross laches in prosecuting rights, or long and unreason-
able acquiescence in the assertion of adverse rights.   And
the mere assertion of a claim, 'unaccompanied by any act to
give effect to it,' (as, by undertaking legal proceedings to en-
force it,) will not avail to keep it alive.   Under such circum-
stances, it would in any case be impossible to interfere with-
out doing injustice to the persons who had acquired interests
in the property during the intervening period.   It has been
beautifully remarked with respect to the emblem of time, who
is depicted as carrying a scythe and an hour glass, that while
with one hand he cuts down the evidence which might pro-
tect innocence, with the other he metes out the period when
innocence can no longer be assailed.   And if you believe,
from the evidence, that Victor Blanco sold the tract of land
in controversy to William Lagurenne in 1836; that Rabago
lived until 1848; that he had actual or constructive notice of
the sale, but during his life never protested against it, nor
paid taxes on the land, nor looked after said land, then you
may presume acquiescence on his part in said sale.   Or if
you believe, from the evidence, that through a series of inter-
mediate conveyances the defendants obtained title to said
lands; that they spread upon the proper records 'of the coun-
try' their title deeds, entered upon the land, paid taxes on the
same, and claimed and controlled it openly and notoriously
for a series of years, and that neither the said Rosa M. Cor-

tez nor her husband, Antonio Cortez, ever paid taxes on the same or looked after it, but slept upon their rights, and no steps were taken legally to assert their claim until the institution of this suit by plaintiff on the 11th day of September, 1873, then she is chargeable with notice of the adverse claims of defendants, and was guilty of such gross laches and neglect that no recovery can be had upon the claim of plaintiff, and you will in such a state find for the defendants,—unless plaintiff has shown that Miguel Rabago or Rosa M. Cortez and her husband labored under some disability, 'or other impediment,' by which they were prevented from asserting their rights sooner, and reasonably account for why they have never paid taxes on the land. And in this connection you are instructed, that while the disability of coverture or marriage will furnish a sufficient excuse for a married woman, ordinarily, not instituting a suit to recover her landed property, yet if you believe, from the evidence, that neither Rabago nor Cortez and his wife ever paid tax on the land, or made any efforts to exercise acts of ownership and control of the land until the institution of this suit, you may take these facts into consideration, in this branch of the case, in determining whether the failure to sue sooner was from the fact that Rosa M. Cortez was a married woman all the time. And you are charged, that laches cannot be imputed to a married woman, unless under circumstances so gross and strong, by reason of some affirmative act of hers, as to operate a fraud upon the rights of innocent third parties."

On this subject, at the instance of plaintiff, the court gave the additional charge: "That defendants, in order to claim the benefit of the laches of a party, must show that they bought the land in good faith, and paid for it, and made valuable improvements, and were induced to do so because of the laches of plaintiff or of those under whom he claims."

The additional facts will sufficiently appear in the opinion.

The jury found a verdict for defendants; new trial was refused, and plaintiff appealed.

*Herring, Anderson & Kelly,* for appellant.

*Thomas Harrison* and *Flint & Chamberlin,* for appellees.

I. The power of attorney from Rabago to Victor Blanco as an ancient instrument was obtained from the proper place, was free from suspicion on its face, and had been acted on. It was properly admitted in evidence. (Stroud *v.* Springfield, 28 Tex., 663; 1 Greenl. Ev., secs. 144, 570, and notes; 2 Cow. & Hill's Notes to Phil. on Ev., 369, 370; Carter *v.* Chaudron, 21 Ala., 72; Doe *v.* Roe, 31 Ga., 593; Hedger *v.* Ward, 15 B. Monr., 106.; White *v.* Hutchings, 40 Ala., 253; Burgin *v.* Chenault, 9 B. Monr., 285; Taylor *v.* Cox, 2 B. Monr., 429; Caruthers *v.* Eldridge, 12 Gratt., 670.

II. The evidence of the existence and contents of the power of attorney from Lagurenne to Prioland was competent. (1 Greenl. Ev., sec. 4; Las Caygas *v.* Larionda, 4 Mar., 283; Mauri *v.* Heffernan, 13 Johns., 58; Escriche, (Madrid ed.,) art. Instrumento Publico, p. 892; 11 Nuevo Febrero Mexicano, tit. 50, chap. II, sec. 8, p. 572.)

III. The evidence was sufficient to have authorized the jury to presume the authority of Blanco, even had the paper objected to not been produced. (Watrous *v.* McGrew, 16 Tex., 512; Daily *v.* Starr, 26 Tex., 565; Lewis *v.* San Antonio, 7 Tex., 302; Schauber *v.* Jackson, 2 Wend., 16; Buhuls *v.* Boudousque, 6 Mart., (N. S.,) 80; Galan *v.* Goliad, 32 Tex., 788; Hooper *v.* Hall, 35 Tex., 37; Morris *v.* Byers, 14 Tex., 279; Tyler on Eject., 568.)

IV. The charge on laches seems to be supported by authority. (2 Story's Eq., sec. 1520, and note; Smith's Man. of Eq., 19; Wagner *v.* Baird, 7 How., 258; Smith *v.* Clay, 3 Brown Ch., 639, in note.)

V. If the court should hold that the power of attorney from Rabago to Victor Blanco was properly admitted in evidence, the judgment should be sustained, even though it should find that there are errors in the admission of evidence,

38

and in instructions upon other points; because the power to Blanco, and the deed from him, as attorney, to Lagurenne, put the title out of Rabago, and there was nothing left to descend to his widow. It showed an outstanding title. (Burleson *v.* Burleson, 28 Tex., 412; Schauber *v.* Jackson, 2 Wend., 13, 14; Tyler on Eject., 560, 562, 564; Doe *v.* Butler, 3 Wend., 150; Bloom *v.* Burdick, 1 Hill, 130; 2 Greenl. Ev., 33.)

MOORE, ASSOCIATE JUSTICE.—The first ground assigned by appellant for the reversal of the judgment in this case, is the overruling of his objections to the paper writing offered in evidence by appellees, purporting to be a letter of attorney from Miguel Rabago to Victor Blanco, dated June 8, 1832, authorizing him, by himself or through some one in whom he had confidence, to procure title and take possession of the eleven leagues of land, for which a concession in sale had been given him by the proper authorities; and further authorizing said Blanco to sell, exchange, or alienate the same, as he might see fit; and the indorsement on said instrument, purporting to be given April 3, 1833, by said Blanco to Samuel May Williams, authorizing him, as agent or attorney, to solicit title to and take possession of said eleven leagues of land.

The signature of Blanco to the delegation of authority to Williams to apply for possession and title to the land, was proved to be genuine. But there was no direct testimony whatever of the execution by Rabago of said letter of attorney to Blanco, but it was claimed to be admissible solely upon the ground of its being an ancient instrument.

Appellant, however, insists that it was error to admit it as an ancient title paper: first, appellee had not shown that it came from the proper custody; second, it was not free from suspicion; third, there was no proof showing that it had been so acted on as to afford corroborative evidence of its genuineness.

Unquestionably, when a paper is offered in evidence solely

upon the presumption of its genuineness from its apparent age, if it appear to be lacking in those indicia of a genuine instrument it should in general be excluded, though in other respects properly admissible as an ancient instrument. But an inspection of the record shows beyond all question that neither of these objections to the admissibility of this instrument, if properly made in the court below, (which, however, was not the fact as respects the last two,) should have been sustained.

Evidently, the probative value or effect of such instruments depends in a great degree on their having been contemporaneous with the fact which they are relied upon to prove. It is, therefore, held that it should, at least, *prima facie* appear that the instrument comes from or was found where it might reasonably be inferred it should have been if genuine, or otherwise properly accounted for. Now, where should we have expected to find this instrument? Certainly we would infer that it should have been placed by the commissioner to whom it was presented either with the papers pertaining to the title which he issued for the land, or have been returned to the party by whom it was presented to him. But as the title shows that it was not incorporated into it, as is most usual where the power is an authentic act, we should expect to find it in the custody of Williams, in whom the title and possession of it purports on its face to be vested; or if not, that he would have transmitted it to his principal, Blanco. But as the latter appears to have taken the precaution to have another power of like effect from Rabago, or to have secured an official copy of this one before remitting it to Williams, there was no necessity for its being returned to him. In the light, then, of all the facts exhibited in the record, we think that it is manifest that the paper was found where the inquirer would naturally have first gone in search of it. But if we admit that Williams, to whom it had been transferred, was not the most appropriate custodian of it, still it cannot be denied that among his papers, certainly, was a reasonable and rational

place, under the circumstances, for it to have been found; which is all that is required. (Croughton *v.* Blake, 12 M. & W., 205.)

There was nothing shown by the instrument to cast suspicion upon its genuineness. It was an old and faded paper, and was apparently of corresponding age with its purported date of execution. It was free from erasure, interlineation, and alteration, and exhibits no apparent blemish of any character whatever. Appellant insists, however, that the genuineness of the signature of Rabago was impeached by his witnesses; and that it was shown by appellees themselves, that Blanco must have had this same power, or copy of it, in the city of Mexico, in 1836, when he conveyed the land to Lagurenne; which facts, he insists, cast such suspicion upon its genuineness as to have precluded its admission as· an ancient instrument. But the ground of suspicion from which such instruments must be freed before they are admissible in evidence, refers to something apparent upon their face, or shown by some fact or circumstance directly connected with them, and not to extraneous testimony, which is for the jury in passing upon their genuineness, after they are admitted. (1 Greenl. Ev., sec. 21.)

Unquestionably, it cannot be correctly said that the instrument here in· question had not been so acted on as to afford some presumptive corroborative proof of its genuineness. It was acted on by Blanco when he empowered Williams to apply for a title and possession of the land; also, by Williams when he presented it to the commissioner; and, again, by the commissioner when he issued the title. But it is said that Williams may have acted under some other power. Certainly, such conclusion is wholly unwarranted, and would be most unreasonable. Appellant shows that he could not have acted under authority conferred upon· him directly by Rabago. No circumstance has transpired from the date of the grant to the present time to justify the slightest inference that any one else than Blanco ever claimed to have authority

to authorize him to make the application on which the title was issued. This power was unquestionably transmitted to him by Blanco, for his signature to it was proved, and not denied by appellant. Blanco must have had in his possession the concession from the governor authorizing Rabago to purchase the land, and must have transmitted it with the power to Williams, for he certainly knew that Williams could not get the title without it. There is no other reasonable ground to account for its getting into Williams' hands, or for his subsequent action. The power accompanying his application was not retained by the commissioner. The testimonio of the title, which was delivered to Williams for his principal, he transmitted to Blanco, who had it, and passed it to the purchaser, when he subsequently sold the land, in the city of Mexico, to Lagurenne. The land has been claimed and held under and by virtue of this power from Rabago, or copy of it, which Blanco could have procured, if he desired, even without the concurrence of Rabago, (Eschriche, 686–688,) from its sale, without question or adverse claim by any one for nearly forty years. The authority to sell was openly and publicly claimed and exercised by Blanco, and the purchasers under him, before and in presence of a number of different officers and their assisting witnesses, by the payment and registration in the proper office of the receipt for the alcabala or tax on its sale, and by having the notarial acts of sale duly authenticated by the College of Notaries. Payment of the amount claimed by the Republic of Texas as due it for the land, was also made after its separation from Mexico; and in a reasonable time after the section of the State in which the land is situated began to be settled, actual, open, visible, and notorious possession and control of it was taken by the parties in whom the title under this power was then vested.

In connection with the many acts of the different parties who have been and are claiming this land, or portions of it, under this instrument, the fact is not without significance, that not one single act was done, either by Rabago or his wife, or

her second husband, from the date of this power to the time of appellant's purchase, a period of over forty years, tending to show that they had, or supposed they had, any right or title to it; and if we are to believe Mrs. Rabago, now Mrs. Cortez, no steps whatever were taken by Rabago to obtain a title for the land which he was authorized by the concession to acquire. When he returned in 1828 from Monclova with the concession, it was placed in a trunk with other papers, and remained there, as she supposed, though not seen by her during the time, until the fall of 1833, when, as she says, it was stolen; and from that time until the sale of the land to appellant, in 1873, no effort is shown to have been made, either to recover the concession or get a duplicate or an authentic copy of the original from the office of the Secretary of State, as doubtless might have been easily done, if in fact it had been lost or stolen.

Rabago certainly must have known, if a title had not been obtained on the concession before the spring of 1836, that no land could be acquired by virtue of it in Texas. If the title had been issued prior to that date, the records and reports of the commissioners who were intrusted with the duty of extending titles on such concessions would point to the locality, and enable him, upon proper inquiry, to have learned on whose application the title was issued. The testimony in the record shows that he could, by proper inquiry, have ascertained when and upon whose application the title issued. The records and papers of the commissioner (Alderite) who issued the title were returned to and deposited in the proper office at the capital of the State, from which it was withdrawn by appellant subsequent to the bringing of this suit. If Rabago had made the least effort to inform himself in regard to it, he would no doubt have learned that it had been issued on the application of Williams, a well-known citizen and public officer in the colonial enterprise in which the land was situated; and had application been made to him, he would no doubt have learned under what authority and at whose in-

stance he had made application for it,. and what he had done
with the testimonio of the grant.   True, any inquiries which
should have been made by Rabago in Texas, would have
been attended with great difficulty and embarrassment, from
the fall of 1835 until the close of hostilities between the gov-
ernment of Mexico and the United States, in 1848; and his
failure to make them during this period should be overlooked
or excused.   But an examination of the public records of the
State of Coahuila would have put him in possession of facts
which, we can hardly doubt, would have easily enabled him
to have ascertained how and by whom the land was then
claimed.   It can hardly be supposed, if he had made inquiry
of Alderite, who issued the title, that he would not have
learned that Williams was acting at the instance and under
the authority of Blanco, who was claiming the land under
letter of attorney from him.   But admit that no laches can
be imputed to Rabago in failing to inform himself as to his
rights in respect to this land after the commencement of the
war between Texas and Mexico, surely this cannot be done
after the treaty of Guadalupe Hidalgo, which made ample
provision for the assertion by citizens of Mexico of their
rights to land in Texas; and although Rabago died in 1848,
and his widow married in 1849, and continued to be *feme-
covert* until 1875; yet these facts do not rebut the presumption
or inference that the true owner of property will not, during
a long period of time, totally neglect to assert his right or
give some notice of his title.

The conclusion from the facts to which we have referred,
and others exhibited in the record to which we have not ad-
verted, are, in our opinion, amply sufficient not only to prove
that the letter of attorney from Rabago to Blanco had been
acted on by Blanco, and those claiming the land through him
under this instrument, to authorize its admission in evidence
as an ancient instrument, but if this was the question before
us we could hardly hesitate to say that they were not fully
sufficient to warrant the jury in finding they conclusively

proved its due execution as a question of fact, after it was admitted. The various circumstances, extending through a period of forty years, which lead to this conclusion and repel the reasonableness of any other hypothesis, can, it is believed, hardly be successfully rebutted or outweighed by the necessarily treacherous memories of the few living witnesses who were contemporary with the transactions. Even if the power had not been produced, the facts disclosed in the record were certainly more than sufficient, under the former decisions of this court, to have justified the presumption of its existence and due execution.

3. The court did not err in overruling the objection to the copy of the power of attorney from Lagurenne to Prioland. A copy, if duly authorized, of the protocol given by the notary in charge of the records or archives of the notary before whom the sale was passed, and by whom the matrix or protocol is registered, is entitled, by the law under which this instrument was executed, to equal credit as the original itself. (Eschriche, 886–896.) A transfer or conveyance of land by act of sale of this character, before a notary beyond the limits of Texas, has long been recognized by this court as valid and binding, and a duly certified copy of the notary's record as admissible to prove such sale. (Watrous *v.* McGrew, 16 Tex., 512; 4 Martin, 283; 13 Johns., 58.)

The notary purports to act, in making the copy offered in evidence by appellees, in obedience to a judicial order to this effect. His certificate and seal to the copy was verified by the certificate and seal of the College of Notaries in the city of Mexico; which was also verified by the certificate and seal of the Governor of the Federal District of Mexico; and this certificate is likewise verified by the certificate of the proper secretary of the department of Foreign Relations of the National Government of Mexico, under the seal of said department, which seems to be the seal used for establishing the truth and verity of public documents and records, to be proved or recognized as such in the tribunals of foreign

countries, and of which the public tribunals and functionaries of other countries take cognizance and regard as importing absolute verity. (1 Greenl. Ev., sec. 4; Church *v.* Hubbart, 2 Cranch, 176.)

4. In view of the testimony upon which the case was submitted to the jury, it was unnecessary for the court to have given any instruction whatever upon the subject of limitation, or in respect to the necessity of proof by the plaintiff showing that the defendants were in possession of the land for which they were sued; but issues to which the charge here referred to were presented by the pleadings, and certainly there was testimony before the jury pertinent to them. Had there been any conflict in the testimony, it would clearly have been the duty of the court to have instructed the jury upon them; but appellees having failed to adduce any evidence tending to maintain their defense, thus presented in their pleadings, the court might have appropriately pretermitted any charge upon the subject. Still, as the instructions themselves are not incorrect or inapplicable to the facts or issues before the jury, appellant evidently has no just ground to complain of them. There is nothing exhibited in the record to justify the belief that he suffered any injustice by reason of this portion of the charge, or that the jury were blinded by it or misled into an erroneous or improper verdict.

The only remaining question which we need consider, arises upon the instruction given by the court in regard to the effect of the laches of the plaintiff, and those under whom he claims, in asserting title to the land for the recovery of which the suit is brought. It is apparent, from what has been previously said, that this part of the charge, like that just referred to, might have been omitted as unnecessary to the proper determination of the case; but it cannot be said that it presents to the jury either a clear or correct exposition of the law upon the subject of which it treats. It is, on the contrary, confused, and in some respects contradictory; and, obviously, was calculated to lead the jury to the conclusion, that although the

letter of attorney under which Blanco sold the land may not
have been genuine or valid, yet the mere omission of Rabago
and his wife, and her second husband, to pay taxes upon the
land, their failure to take the necessary steps to ascertain the
facts of appellee's claim to it, and their delay in asserting
their title, were sufficient to defeat appellant's recovery of it.
Unquestionably, these circumstances were appropriate matters
for the consideration of the jury, in determining whether the
letter of attorney under which Blanco claimed authority to
sell the land is genuine and valid,—if, indeed, they should
not be held as conclusive of it.    But we know of no authority
to warrant the court in holding that the mere failure to pay
taxes, or the laches or delay of the owner in bringing suit for
the recovery of land to which he has a legal title, will defeat
his action, where there has not been actual adverse possession
for a sufficient length of time to support plea of limitation.

Appellee insists that the error in the charge of which appel-
lant complains is corrected by the court in the latter part of
its instruction; but while this is true in part, it is not entirely
so; but if it had been, we cannot say to which part of the
charge the jury may have given controlling weight.    It is also
claimed, that as the facts demonstrate beyond all reasonable
doubt the genuineness of the letter of attorney to Blanco,
and as the deed from Blanco to Lagurenne was admitted
without objection, the plaintiff evidently had no interest in the
land, and the defendants were entitled to a verdict irrespective
of the plea of laches, and consequently the error in this branch
of the charge is immaterial.    I must admit that I incline to the
opinion that the want of title in appellant is so manifest, from
the entire record, as to authorize an affirmance of the judg-
ment, notwithstanding the error in the instruction, upon the
ground that where it is plainly manifest that the correct result
has been attained by the judgment, it should not be reversed
for mere immaterial error, which it cannot be reasonably sup-
posed will or should change the result of the case in another
trial.    But the majority of the court are of the opinion, that

as we cannot say the verdict may not have been found solely upon the defense of laches, to disregard the error in the charge and affirm the judgment might result in this court affirming a judgment of the court below not only without a verdict to support its judgment, but, on the ground upon which we would place our judgment, absolutely against the verdict of the jury.

For the error of the court in the charge as to laches, as in itself an absolute defense to the action, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.