## H. H. LENON v. JAMES C. WALKER.

### (No. 3775.)

TRESPASS TO TRY TITLE.

DESCRIPTION IN DEED.— The following description in a deed held sufficient: " One hundred acres known in the division as part of that lot having the original lines of the league for its northern and southern boundaries and adjoining on the east the lot No. 11."

APPEAL from McLennan county.    Opinion by QUINAN, J.

STATEMENT.— This suit in trespass to try title was brought by Walker against Lenon for the recovery of land which is described in the petition as " four hundred acres of land, being a part of the George Morgan headright league;  .  .  .  the said four hundred acres being known and designated in the partition of said league among the heirs of said Morgan  .  .  .  as lot No. 12, and is bounded on the south by a five-league survey in the name of T. J. Chambers, on the north by the Brazos river."

Lenon pleaded not guilty, and that he holds possession of the land as agent and superintendent for W. S. and J. L. Lenon, who are the heirs of W. T. Lenon, deceased. He pleads that said W. S. and J. L. Lenon, through and by him and their ancestor, from whom they inherited the land,

had possession, etc., for more than three and five and ten years, etc., in conformity with the statute of limitations, and that plaintiff's action is barred. He suggests improvements.

The case was submitted to the judge, a jury being waived. We find in the transcript an agreement by the attorneys of the parties for the reading of original muniments of title, copies, etc., to facilitate the trial. Among the muniments of title to be used by defendant are the following:

Basquez's title to eleven leagues of land, office copy.

Manchaca's title to eleven leagues of land, office copy.

The statement of facts recites that the plaintiff read in evidence:

1. "Land office copy of a title to one league of land, issued by Wm. H. Steele, commissioner for Robertson's colony, to George Morgan as a colonist, dated September 7, 1835.

2. "Certified copy of partition of the estate of George Morgan, deceased, among his heirs, June 8, 1840, from which it appeared that lot 6 and lot 12 were set apart to George W. Morgan.

3. "Copy of deed from Geo. W. Morgan to Mandred Stroud, dated October 8, 1845, conveying the lot 6, describing it as bounded on the east by lot 3, on the west by lot 7, and having the original lines of the league for its north and south boundaries, and then conveying the land in controversy as follows:

"Also one hundred acres of land known in the division of the afore-mentioned league of land of George Morgan, deceased, as part of the lot on block No. 12, having the original lines of the said league for its north and south boundaries, and adjoined on the east by lot or block No. 11, known in the division of said league of land as being numbered as hereinafter set forth.

4. "Certified copy of deed from Mandred Stroud to J. C.

Walker, dated June 23, 1857, conveying the block known in the division of the league of land granted to Morgan as the block No. 14, etc.; and

"Also one hundred acres undivided out of block No. 12, according to said division of said league among said heirs, being a portion of said league."

The defendant admitted he was in possession now and when the suit was brought of the land claimed.

The defendant then read in evidence a certified copy from the general land office of "a translation of a title issued to J. C. Peyton as attorney for Gregorio Basquez."

Aso similar title issued to Robert Barr as attorney for Jose Antonio Manchaca.

Both these titles were issued in 1833, and it was admitted cover the land in controversy.

To the admission of these documents to prove an outstanding title plaintiff objected, "because no offer was made to prove that said titles were now valid and subsisting and superior to plaintiff's title." The objection was overruled.

The plaintiff, in rebuttal, introduced testimony tending to show that George Morgan and his family had at one time lived upon the league granted to him; that George Morgan was killed by the Indians on the land in 1839. Some persons were living on the land in 1840 and 1841, but who they were is not shown; there were then indications of improvements of several years' standing. There was proof of the occupancy of the lot No. 13 by one Fortune, claiming under the Morgan title, in 1853, and of claim to a large part of the league under it by Fortune. In 1858 or 1859 the witness Fortune says he first heard of the Basquez and Manchaca titles. He says: "My father being then in possession under the Morgan title, made some trade for these titles and had some litigation with B. G. Shields, which was compromised." There was never any entry under those titles.

In 1856 or 1857 the Basquez land was assessed for taxes.

Plaintiff Walker, for himself, testified substantially to these facts:

That he sold the block No. 14, in the Morgan league, containing four hundred acres, to old Lenon, through Gen. Harrison, acting as Lenon's agent. He had refused to sell this lot No. 14 unless the one hundred acres also were purchased, and all taken into actual possession. He says: "After some negotiations Gen. Harrison, as the agent of Lenon, said that he expected Lenon out from Mississippi; . . . that he would advise him to take the one hundred acres at the same price, and that he had no doubt that Lenon would do as he advised; that he intended to open a new field or extend a field, and would so run the fence as to include a part of my one hundred acres; that he would hold possession under and for me, so that, in this way, my title would receive the benefit of actual possession as much as if included in the sale. Upon the strength of this promise of General Harrison, acting as the agent of Lenon, I made a deed to Lenon for the four hundred acres; . . . I refused to make it until Harrison had made me that assurance and promise, and consequently I say I authorized Gen. Harrison, as the agent of Lenon, to take possession and cultivate at least a portion of the one hundred acres. I intrusted my business at that time in Falls county to Mr. Craik; . . . I do not know whether or not he ever saw or had any definite understanding with Mr. Lenon, deceased, but I never received any notice to the contrary from Mr. Lenon or Gen. Harrison, but that the promise and agreement of Harrison and myself in regard to the taking of actual possession of the one hundred acres was carried out according to the understanding between Harrison and myself."

At the spring term, 1862, of Falls county court, Walker saw the defendant, old Lenon having died, and spoke to him about the agreement with Harrison as to the possession, and "requested him to continue to hold possession for me, to which he assented." Soon after defendant wrote to

Walker as follows: "As it might be prejudicial to the interest of the estate of my brother, I cannot act as a tenant or an agent in any capacity for you." Walker says: "This was the first intimation I ever received of any adverse interest or claim by Lenon or his estate. Up to the time that the defendant refused to hold as my tenant or agent, as above stated, I supposed and believed actual possession of the one hundred acres was taken by Harrison, . . . and continued by Lenon, to whom I sold the four hundred acres, and, after his death, by the defendant in this case."

This is the material testimony in the case.

The court rendered judgment for the plaintiff for the four hundred acres against H. H. Lenon in his own right, and as agent of W. S. Lenon and J. L. Lenon, from which this appeal is prosecuted.

The assignment of errors states them in a lengthy and argumentative way, but in brief they substantially present these points:

1. That the conveyance from Morgan to Stroud conveys not an undivided interest, but a specific one hundred acres, and that plaintiff could not recover the whole block.

2. That the Basquez and Manchaca grants were a superior outstanding title.

3. That there was no proof that defendant or those for whom he holds, or Lenon, senior, was ever tenant of plaintiff, or held the land for him.

4. That there was no proof of defendant's agency, and it was error to render judgment against him as agent.

5. That the proper parties were not made.

6. That there was no presumption or limitation shown against the outstanding titles.

Opinion.— The first assignment of error presents the question, what is the proper construction of the deed in respect to the description of the land it purports to convey from Morgan to Stroud, under which the plaintiff claims?

The description of the deed is: "One hundred acres of the land known in the division of the Morgan league as part of the lot No. 12, having the original lines of the said league for its north and south boundaries, and adjoined on the east by lot No. 11, known in the division, etc., as hereinafter set forth."

The partition referred to in the transcript has a plat attached which indicates plainly the location of the lot No. 12. Its north line is the boundary line of the league; its southern boundary is the Brazos river, also the boundary line of the league. On the east is the lot No. 11, on the west the lot No. 13. The lines which separate the lots are perpendicular to the southern boundary line of the league. Upon the face of the plat is marked its number, 12. A perfect and accurate description of the land it covers is given simply by reference to its number in the partition. Reference to its northern or southern boundary or what lot bounds it on the east is mere surplusage and adds nothing to proof of its identity.

The description in the deed: "one hundred acres known in the division as part of that lot having the original lines of the league for its northern and southern boundaries, and adjoining on the east the lot No. 11," if we assume, as seems to be the most natural assumption, that the grantor is endeavoring to designate the land he had sold, employs all the terms which would be necessary to do so, and the omission of which would render the description indefinite. The one hundred acres can, by that description, be accurately located. Its eastern boundary is the lot 11. Its northern and southern boundaries the league lines; and its western boundary, of course, to include one hundred acres adjoining the lot 11, should, it would seem, be a parallel line with the line of that lot. This would be readily understood by any competent surveyor, and he would have no hesitation, by the description in the deed, in so running the lines. And this rule has been often received and declared by the courts. The west half of a lot has been held to be

a definite description of a lot of land, and separates it into two parts by a line parallel with the east or west line. Schmitz *v.* Schmitz, 19 Wis., 226.

The words used as west or east half are said to have a very precise meaning. So a deed for land which describes it as the northwest corner of a particular section was held good as conveying the land in the form of a square in that corner. Bybee *v.* Hagerman, 46 Ill., 519.

And in Arnold *v.* Cauble, 49 Tex., 528, the descriptive terms, the north half, the south half, are recognized as vesting separate interests in severalty in the grantees. In truth, this rule of describing lands in Texas as by the upper or lower half or portion of a tract of land, or such a number of acres off a particular end of a survey, is very common. It has, we believe, never been considered as creating a tenancy in common. To give such construction now to the terms would very greatly unsettle and disturb very many titles to lands in this state.

If then, as we think, the description in this deed is sufficiently accurate to designate a separate plat of land, what is there in it to indicate a contrary design in the grantor? Had it been intended to convey an undivided interest, words expressive of that intent would doubtless have been used. The terms employed are not the natural ones indicative of such intention. "One hundred acres of land, known in the division as part of the lot No. 12," seems to us to be as specific a designation of a separate interest as could well be employed. It means one hundred acres, known in the division. How known? As adjoining the lot No. 12. Where the land is can be determined instantly by looking at the plat. But it is suggested by the appellant that the word "known" in the deed must apply to the lot and not to the one hundred acres, because there is no division of that one hundred marked in the plat. This would be to torture language out of its plain meaning. "One hundred acres, known in the division as part of the lot No. 12," is not an ambiguous expression; it is the one hun-

dred acres which is known, and not the lot. Again, it is said that the conclusion of the sentence, "having the northern and southern lines of the league for its boundaries, and adjoining lot No. 11," must be held to apply to the lot No. 12. We have seen that this would be an unnecessary particularity of description of that lot. The thing to be described was the one hundred acres; the controlling subject in the sentence is the land, the part of the lot, and the plain sense of it is, that the description in the latter portion of the sentence has relation to that and that only.

We have no hesitation in saying that, in our opinion, the land conveyed was not an undivided interest, and that, consequently, the first assignment of error is well taken. Walker had no right to a recovery of the whole four hundred acres.

The second assignment is that the Basquez and Manchaca grants should have been held to be superior outstanding titles.

Unless it were shown that the defendant occupied such relation towards the plaintiff as would preclude him from setting up a valid subsisting superior title to the land against him, we perceive no good reason why these grants, as presented, did not make out such a title. The objection offered by the appellant to their reception in evidence, because no offer was made to prove that said titles were valid and subsisting and superior titles to plaintiff's, was properly overruled.

It is urged by appellee that something more than the mere production of the grant is necessary to establish the superiority of the "title;" he cites as authority 10 and 28 Tex. The title under which he claims from the government to Morgan, issued in 1835, is proven in this record by certified copies from the general land office, and so are the titles to Manchaca and Basquez. They are all grants from the sovereignty of the soil, authenticated as of equal dignity and imparting equal verity. But the titles to Basquez

and Manchaca are prior in point of time as issued in 1833, and are, therefore, upon the face of them, superior titles.

And as is said in Williams *v.* Conger, 49 Tex., 602, in respect to a similar title, " we know of no authority to warrant us in holding that the mere failure to pay taxes, or the laches or delay of the owner in bringing suit for the recovery of the land to which he has a legal title, will defeat his action where there has not been actual adverse possession for a sufficient length of time to support the plea of limitation."

And it is quite certain that there is no testimony to show that the titles of Manchaca and Basquez, which it is admitted cover the land in controversy, are barred by lapse of time. The partition of the George Morgan league among his heirs was made in 1840, when the lot No. 12 was allotted to George W. Morgan. There is no proof of possession by him or by any one claiming under him of that lot since that period. If we suppose that the Basquez and Manchaca titles were the superior titles to the land, this claim to the lot No. 12 would not be defeated by limitation because other persons occupying other portions of this grant might have acquired title to such other portions by adverse possession. Since the partition, which was made before the passage of the limitation law, no one claiming under the partition the lot No. 12 could derive any benefit from the possession of other parties holding other lots, or set up their possession of other lots to aid him in defeating the claim of the true owner of the lot No. 12 by the plea of limitation.

Judging, then, from what appears in this record, there is nothing to impeach the validity of the Basquez and Manchaca titles, or defeat the conclusion that, being the elder, they have the better title.

3. But it remains to consider whether defendant's relations to the plaintiff preclude him from setting this up. We have carefully considered the testimony, and we are

unable to find the least testimony to support the claim of the plaintiff that Lenon was at any time his tenant, or that the land was ever, before the date of Lenon's letter to him declining to act as his tenant or agent, in the possession of the land, or Harrison or any person whatever. Harrison's promise to take possession of the land and hold it for plaintiff was not equivalent to actual possession.

4. It is assigned for error that judgment was improperly rendered against Lenon as agent.

If judgment was properly rendered against him at all, styling him agent of Lenon, etc., would not vitiate it. It was a description of the person. It bound no one but himself, and though certainly very unusual and irregular, was simply immaterial.

REVERSED AND REMANDED.